# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-60701-CIV-DAMIAN

**STEVEN B. AUBREY,**

     *Plaintiff,*

**v.**

**JOHN D. FRY;**
**BRIAN D. FILLINGIM; and**
**GLEN A. FITZMARTIN,**

     *Defendants.*

_____/

```
FILED BY_____ 𝓔𝓑___D.C.

JUL 2 6 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.
```

---

## FIRST AMENDED COMPLAINT

This is a civil rights action under 42 U.S.C. 1983 seeking redress for the deprivation of liberty and fundamental rights guaranteed, *inter alia*, by the United States Constitution, Florida Constitution, and Florida State law. Plaintiff Steven Aubrey, a man who had committed no wrong, was subjected to the defendants' conspiracy to illegally seize his person without just cause or reasonable suspicion, violating his Fourth Amendment rights.

On May 13, 2016, Ira Tobolowsky died in a fire at his home in Dallas, Texas. Ira Tobolowsky was linked to powerful Texas families by blood, marriage, and business interests. These Texans are powerhouses throughout Texas and beyond: politically, legally, culturally, and economically. The powerful Tobolowsky family controlled the corrupt investigation that they steered towards Plaintiff, who was subjected to 13 search warrants.

Though their focus was on Plaintiff, the Dallas Police Department ("DPD") conducted a thorough investigation that involved many persons of interest. There was no evidence connecting Plaintiff to the fire and death and the case became cold.

At the direction of the Tobolowsky family, the DPD and two thugs assaulted Plaintiff and his spouse with deadly weapons, causing them to flee from the gun violence in Texas. They moved to South Florida and later purchased a home.

Six years after relocating to Florida, without probable cause, Plaintiff was arrested for the murder of Ira Tobolowsky. The case remained free of evidence, but material lies and omissions in a perjured affidavit for arrest warrant caused Plaintiff's false arrest and material lies and omissions in perjured testimony before a grand jury caused Plaintiff's indictment.

It is a basic right of persons in the United States to travel freely without being seized by armed agents of the state without just cause, a right denied to Plaintiff. One of the primary purposes of civil rights laws is to protect citizens from abuses by government. Defendants acted under color of state law and as a result of this conduct, Plaintiff was deprived his rights, privileges or immunities secured by the U.S. Constitution.

The Tobolowsky family conspired with defendants to falsely arrest and seize Plaintiff. Defendants falsely imprisoned Plaintiff, depriving him of his liberty for 625 days until two weeks before the trial when the prosecution requested dismissal of the case, stating: "it has been determined that the State is unable to make a prima facie case at this time." This serves as an admission that the State *never* had a prima facie case against Plaintiff

Under color of law, Defendants committed acts of perjury, official misconduct, and malicious prosecution, deprived Plaintiff his rights under the Constitution, and deprived Plaintiff his rights under federal law and federal statutes. Defendants committed numerous torts

under Florida law. Working together, Defendants maliciously and proximately caused injury to Plaintiff, including but not limited to false imprisonment, personal humiliation, mental suffering, impairment of reputation and lost earnings capacity.

## I. JURISDICTION

1.      This Court has subject matter jurisdiction under 18 U.S.C. §242 because this is an action asserting claims based on deprivation of rights under color of law.

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action asserting claims based on federal law.

3.      This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because damages exceed $75,000.00 and some defendants are from different states.

4.      This Court has jurisdiction pursuant to 28 U.S.C. §1343 because this is an action asserting claims based on the deprivation of civil rights due to color of law and/or conspiracy under 28 U.S.C. §1343(a)(b).

5.      Plaintiff alleges civil rights violations including but not limited to claims of false arrest, false imprisonment, conspiracy under color of law and others.

6.      This Court has subject matter jurisdiction under 28 U.S.C. §1367(a) because Plaintiffs' state-law claims are so related to the federal claims in this action that they form part of the same case or controversy.

7.      This Court has jurisdiction pursuant to 42 U.S.C. §§1981(a); 1982; 1985; 1986; and 1988 because this is an action asserting deprivation of Plaintiff's rights.

8.      This Court has jurisdiction pursuant to 42 U.S.C. §1983 regarding deprivation of constitutional rights under the I, IV, VI, and XIV Amendments, acting under color of law.

9.     This Court has jurisdiction pursuant to 42 U.S.C. §1985 regarding the power to prevent a conspiracy, depriving Plaintiff's rights.

10.     Each and all of the acts (or threats of acts) alleged herein were done by defendants under color and pretense of the statutes, ordinances, regulations, customs and usages within the meaning of 42 U.S.C. §1983.

## II. VENUE

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 as most of the events giving rise to the claims occurred in Broward County; Defendants' intentional, tortious and unlawful conduct substantially occurred within this judicial district; and Plaintiff and one defendant currently reside in and transact their principal businesses within this judicial district.

12.     The Court has specific jurisdiction over certain defendants pursuant to *Fla. Stat.* § 48.193(1)(b) as Defendant Brian D. Fillingim entered into the State of Florida with sufficient minimal contacts and committed intentional torts in relation to Plaintiff, or in the alternative, have committed tortious conduct outside of the State of Florida with the specific intent and knowledge that an injury would occur in the State of Florida.

13.     Texas Defendant Brian D. Fillingim traveled to South Florida to participate in Plaintiff's false arrest and false imprisonment in Broward County, Florida.

14.     Additionally, as a result of Plaintiff's injury, he is now is an indigent resident of Broward County and unable to afford travel. If venue were in Texas, Plaintiff would suffer material injustice considering his financial restrictions.

15.     Weighing the factors affecting the convenience of litigants, the only proper venue for this case is the Southern District of Florida.

## III. PARTIES

16.     Plaintiff Steven B. Aubrey is a resident of Broward County, Florida and is before this Court for all purposes.

17.     Defendant John D. Fry ("Fry") is a Broward County court judge whom Plaintiff sues in his individual capacity. He is a resident of Broward County, Florida and is before this Court for all purposes.

18.     Defendant Brian Fillingim ("Fillingim") is a Dallas Police Department cold case detective whom Plaintiff sues in his individual capacity. He is a resident of Dallas County, and is before this Court for all purposes.

19.     Defendant Glen A. Fitzmartin ("Fitzmartin") is a Dallas County Assistant District Attorney whom Plaintiff sues in his individual capacity. He is a resident of Dallas County, Texas and is before this Court for all purposes.

## IV. FACTS

### A. Background

20.     On May 13, 2016, Ira Tobolowsky died in the garage in his home in Dallas Texas. The garage had been consumed by fire.[1]

21.     On the same day, police spoke to the wife of the deceased, Debbie Tobolowsky, and she told the police that she could not think of anybody who wanted to hurt her husband. DPD's Detective Scott Sayers noted that statement in his Police Report and repeated that statement when he was later interviewed by D Magazine about the case.

---

[1] Five months after the fire, the medical examiner ruled the death a homicide. However, experts believe the crime scene photos reflect that the fire was an accident.

22.     On May 24, 2016, eleven days after the fire and death, Detective Robert Ermatinger interviewed Debbie Tobolowsky. She identified a potential suspect but never once mentioned Plaintiff or his spouse, Brian Vodicka ("Vodicka"), as possible suspects.

23.     Plaintiff and Vodicka were familiar with Ira Tobolowsky as they were defendants in a lawsuit filed by Ira Tobolowsky for defamation.[2]

24.     At some point in time, Plaintiff and Vodicka became persons of interest in the investigation of the May 13, 2016 fire and death of Ira Tobolowsky, hereinafter referred to as ("Investigation").

25.     Four DPD homicide detectives conducted a thorough investigation, especially their investigation of Plaintiff, but were unable to discover evidence connecting Plaintiff to the home of Ira Tobolowsky or to the alleged crime.

26.     Ira Tobolowsky had friends, business associates, and clients at the top of Texas society, including the wealthiest and most powerful families in Texas. All succeeded in keeping

---

[2] In 2014, Ira Tobolowsky began representing Plaintiff's brother, Buck Aubrey, in a contentious and ongoing legal dispute over a family trust. The Aubrey Family Trust has four beneficiaries including: Plaintiff; his brothers, Buck and Tom Aubrey; and his mother, Betsy Aubrey. The Trust had income properties that generate over $300,000 profit annually, however, since 2007, Buck Aubrey was the only beneficiary who received any of the money. Plaintiff filed an application with the probate court for an annual accounting of the Trust, in accordance with Texas state law and also the terms of Plaintiff's father's will that created the family Trust. (Plaintiff never filed a claim for monetary damages.) Ira Tobolowsky was earning large fees from the Aubrey Family Trust by continuing frivolous litigation. From 2014 - 2016, Buck Aubrey paid Ira Tobolowsky over $600,000 in legal fees to fight Plaintiff for his right to an accounting. Throughout the litigation Plaintiff filed various pleadings that exposed some of Ira Tobolowsky's participation in mortgage fraud, bank fraud, and fraud on the court, which caused Ira Tobolowsky to file a frivolous lawsuit against Plaintiff and Vodicka for defamation. That case was ongoing at the time of the fire and death. However, Plaintiff and Vodicka became judgment proof as a result of their investment in a real estate scheme, rendering any threat from the defamation suit of little consequence to them. They stopped attending hearings for the defamation case and 1 ½ months earlier had stopped litigating with Plaintiff's family so that Ira Tobolowsky became insignificant to Plaintiff and Vodicka. The litigation between Plaintiff, Vodicka, and the deceased offers no motive for murder. As would be expected, following Ira Tobolowsky's death, Buck Aubrey had no problem replacing him with another attorney who, for significant legal fees, was willing to defend a position that contradicted the terms of the Trust and the laws of Trusts and Estates.

their connections to Ira Tobolowsky out of the media after he died, while breathless attention was focused on the two bankrupted gay men, Plaintiff and Vodicka.

27.     On May 19, 2016, the DPD and Dallas County Sheriff's Office harassed Plaintiff and Vodicka, arresting them at gunpoint *without an arrest warrant*.[3] Evidence of this traumatic event was destroyed by the DPD and the Dallas County Sheriff's Office.

28.     The lead detective in the Investigation, Det. Ermatinger, stated in an interview with D Magazine: "detectives executed more search warrants on the Tobolowsky case—roughly 18—than on any other case he'd worked." Referencing Plaintiff and Vodicka, the detective further stated: "But I had no evidence to arrest them. We like to have a fingerprint at the scene or catch them on a video or, of course, DNA is even better than a fingerprint. They provided all those samples, but we can't match anything at this time."[4]

29.     Debbie Tobolowsky was exceedingly concerned about the tunnel vision of the Investigation that targeted Plaintiff and Vodicka. In the same D Magazine story, she stated: "I'm deathly afraid we've spent all our time focused on them, and someone else is out there laughing, thinking they got away with it."

30.     Either acting on a gut hunch or pressure from the Tobolowsky family, detectives obtained 13 search warrants against Plaintiff, Vodicka, and their properties in 2016. They were unable to cite objective facts or circumstances that would lead them to believe Plaintiff had committed a crime or establish probable cause, Detectives Ermatinger and Sayers repeated the

---

[3] Though law enforcement was required by law to knock and announce when serving warrants on Plaintiff and Vodicka, on this day, officers conducted a violent high-rick apprehension of the men. Following an ambush that included loaded firearms touching their heads, Plaintiff and Vodicka were falsely arrested, transported to police headquarters. They were held against their will from 3:30 p.m. until 1:00 a.m. the following day to simply obtain their fingerprints and photos. This was DPD's first false arrest of Plaintiff.

[4] *See* D Magazine's April 26, 2017 story "A Place Where Something Evil Happened" by Jamie Thompson.

same fabrications and lies in each of their affidavits for search warrants. The falsified affidavits caused various magistrates to issue warrants for:

a)   Verizon's cell phone records, tower information, and data for Vodicka;

b)   Verizon's cell phone records, tower information, and data for Plaintiff;

c)   Home of Plaintiff and Vodicka;

d)   Home of Plaintiff and Vodicka again;

e)   Work site of Plaintiff;

f)   Verizon's text messages for Plaintiff;

g)   Verizon's text messages for Vodicka;

h)   Examination, photographs, and fingerprints of Plaintiff:

i)   Examination, photographs, and fingerprints of Vodicka;

j)   DNA of Steven Aubrey and Brian Vodicka;

k)   Forensic lab examination and testing of the telephones, computers, and other electronic devices;

l)   Google gmail accounts of Plaintiff and Vodicka; and

m)   Credit card records of Plaintiff and Vodicka.

31.   Each of the 13 search warrants was a dismal failure, providing nothing useful to the Investigation. Curiously, the homicide detectives remained laser focused on Plaintiff and Vodicka.

32.   Throughout the Investigation, the detectives ignored material exculpatory evidence favorable to Plaintiff and Vodicka.

33.   A grand jury was formed. Shortly thereafter, Plaintiff was subpoenaed to testify and on his lawyer's advice, Plaintiff declined to answer questions, asserting his constitutional right to remain silent.

34.   ON MAY 23, 2016, THE GRAND JURY DID NOT INDICT PLAINTIFF.

35.     The Tobolowsky family's forceful influence on the Investigation caused the DPD and others to ruthlessly harass Plaintiff and Vodicka.[5]

36.     Certain family members of the deceased, including lawyers and a Federal Administrative Law Judge, requested the FBI and the Department of Justice to investigate and prosecute the case against Plaintiff and Vodicka. The FBI and the Department of Justice, following an investigation, did not file any charges.

37.     On October 13, 2016, Michael Tobolowsky, his two investigators and DPD detectives hatched a plan to separate Plaintiff from Vodicka by luring him across town, falsely arresting him a second time, and simultaneously illegally entering their residence without a warrant to further harass Vodicka.[6]

38.     On October 20, 2016, Plaintiff was falsely arrested on a bogus prostitution charge and concurrently, Detectives Ermatinger and Sayers made a warrantless entry into Plaintiff's and Vodicka's residence. The homicide detectives called the trespass a "wellness

---

[5] Michael Tobolowsky, son of the deceased, engaged two "private investigators" to assist with the Investigation. (Newly licensed, this would be the first investigation for both.) They impersonated DPD detectives to trick Vodicka into leaving with them so they could interrogate him. During the last week of October and on multiple occasions, the investigators stalked and terrorized Plaintiff and Vodicka, trespassing onto private property with weapons, jumping up between cars in their parking lot, pointing loaded firearms at their heads.

[6] Part of this scheme was to arrest Plaintiff on a trumped-up charge for prostitution. The homicide detectives orchestrated the sting and arrest with the vice unit. The arrest was an illegal ruse to isolate Vodicka from Plaintiff. It worked. The second part was to surprise Vodicka while he was alone and vulnerable. As planned, Detectives Ermatinger and Sayers used the pretense of a wellness visit to brace Vodicka at his home alone. The third part of the scheme was to have Michael Tobolowsky's investigators pose as DPD detectives and abduct Vodicka by telling him it was for his own safety, to induce Brian Vodicka to make incriminating statements.
Their scheme was a desperate attempt to kickstart the homicide investigation regarding Ira Tobolowsky and implicate Plaintiff and Vodicka. It was an abject failure. This was DPD's second false arrest of Plaintiff. Though a prostitution charge was never formally filed against him, the case was not dismissed until three days before the statute of limitations had run out, two years later. Plaintiff was required to make 14 appearances on a case that never was! The Assistant District Attorney for the Ira Tobolowsky homicide case was the same ADA for the Class B misdemeanor prostitution case, something never seen before by Plaintiff's Texas counsel.

check."[7] Also on this day, Michael Tobolowsky's private investigators began their ongoing terror campaign against Plaintiff and Vodicka.

39.     Three weeks after the warrantless entry, publication of Plaintiff's photo with news stories about his arrest for prostitution, and repeated assaults with deadly weapons, Plaintiff and Vodicka fled the State of Texas and relocated to Florida.

40.     The DPD determined that after an extensive and all-encompassing investigation, they did not have sufficient evidence to charge anyone (including Plaintiff) with the alleged homicide of Ira Tobolowsky and the unsolved criminal investigation became a cold case.

41.     On July 14, 2020, in a declaration under oath filed by the attorney from the City of Dallas for Detective Ermatinger, the police detective assigned to the case swore to the following:

> **"as a result of this sprawling investigation there is not enough evidence
> to prosecute anyone for the murder of Ira Tobolowsky."**

42.     In July 2021, Defendant Fillingim became a DPD homicide detective and was assigned the Ira Tobolowsky cold case. Like all before him, he was unable to uncover any evidence in the case.

43.     In another attempt to kickstart the Investigation, Michael Tobolowsky met with Fillingim and gave him a 72-page PowerPoint presentation that was crafted to mislead the new detective. The presentation contained multiple false facts, i.e., Plaintiff terminated his ATT cell phone service the night before the fire and death. Plaintiff has never had an account with ATT and he continued his cell phone service with Verizon until late that same year.

---

[7] A Dallas, Texas federal judge ruled by summary judgment that the warrantless entry violated Vodicka's Fourth Amendment rights under the U. S. Constitution.

**B.   Fillingim Presented a Perjured Affidavit for Arrest Warrant**

44.    On April 25, 2022, Fillingim presented a perjured Affidavit for Arrest Warrant ("Affidavit") to a Dallas County, Texas magistrate judge, swearing to its truthfulness. Fillingim's Affidavit contained information that the affiant knew was false or would have known was false had he not recklessly disregarded the truth. It omitted all material exculpatory evidence and contained gross misleading statements. Fillingim's perjured Affidavit is attached as **Exhibit A**.[8]

45.    The Fourth Amendment requires a truthful factual showing in an affidavit used to establish probable cause. Fillingim knew, or had reason to know, that he materially misled a magistrate on the basis for a finding of probable cause. His perjurious or recklessly false statements in support of a warrant deprived the magistrate the accurate information necessary to exercise her informed judgment and thereby impermissibly substituted Fillingim for the magistrate as the actual decision-maker in the warrant issuance process.

46.    Fillingim knowingly presented a falsified affidavit to secure the arrest warrant used to deprive Plaintiff's liberty, arrest him, and destroy his good reputation.

**C.   Affidavit Lies, Omissions, and Misleading Statements**

47.    The DPD's exhaustive investigation of Plaintiff never produced any evidence or even a motive to connect Plaintiff to Ira Tobolowsky's death because Plaintiff was innocent. He had never been to Kenshire Lane, home of the deceased. In fact, the entire first page of the document fails to allege a single fact or circumstance of which the magistrate could make a

---

[8] The lengthy Affidavit includes five pages with 29 paragraphs. To assist with document navigation, Plaintiff has numbered each paragraph. Except for the numbering, there are no alterations of the document.

probable cause determination. Instead, it highlights the contentious relationship between Plaintiff and his mother who, to this date, remains alive and well.

48.     Without basis, Fillingim illogically and magically transferred Plaintiff's anger towards his mother over to Ira Tobolowsky.

49.     Fillingim's perjured Affidavit manufactured a sham motive and false circumstantial evidence to mislead the magistrate. The document is completely void of all material exculpatory evidence. The fictitious Affidavit included no less than 12 material lies, 12 material omissions, and 12 material misleading statements.

**Affidavit Lies**

a)  The Affidavit falsely states: **"Suspect Aubrey then doused Complainant Tobolowsky with gasoline and set him on fire, which caused Mr. Tobolowsky's death."** *Id.* ¶ 8.

Fillingim states this as a fact making this statement false. There has never been any evidence connecting Plaintiff to Ira Tobolowsky's death or to the fire. There are no witnesses, videos, photos, DNA, physical evidence, relevant circumstantial evidence, or even a motive. The DPD Forensic teams tested everything at the site of the fire and many items belonging to Plaintiff. Every test for gasoline residue on Plaintiff's clothes and his car came back negative. Nothing connected Plaintiff to the scene of the fire. All exculpatory evidence indicated Plaintiff was at Plaintiff's home when the early morning incident occurred.

b)  The Affidavit falsely states: **"Hours after the murder, Suspect Aubrey had gone to a scheduled dermatologist appointment at 12::30 PM to have**

**stitches removed from his back. At 1:43 PM, the same dermatologist office called and left Suspect Aubrey a voicemail about his inquiry about IPL, specifically to his hands and arms. IPL is Intense Pulse Light and commonly called a photofacial."** *Id.* ¶ 22.

First, Fillingim lied about a voicemail left by the dermatologist's office. The voicemail did not exist. Fillingim had Plaintiff's phone records that prove the call never happened. While Plaintiff sat in jail for 625 days, his attorneys repeatedly requested a copy of the fictitious voicemail from Fitzmartin, the state's prosecutor in *The State of Texas v. Steven Aubrey*. Fitzmartin could never produce the fabricated voicemail in response to discovery requests. Second, Fillingim cleverly included the word "injury" in his manufactured statement about the voicemail. Plaintiff had no injury, which was known to Fillingim because DPD had the pictures of Plaintiff's arms in the file that evidenced Plaintiff had no injury or burn wounds. Third, IPL is not a treatment for burn wounds.

This is another example where Fillingim maliciously manufactured this false fact into a visit to the dermatologist to seek treatment for burns. Fillingim flipped Plaintiff's powerful and material exculpatory evidence, his May 13, 2016 visit to the dermatologist only a few hours after the fire, further proof Plaintiff had no burns.

c)   The Affidavit falsely states: **"Suspect Aubrey claims that he awoke on the day of the murder around 8:00 AM his apartment located 7777 Glen America and was at there until approximately 9:00 AM, at which time he**

drove to a nearby Trader Joe's supermarket for grocery shopping." *Id.* ¶ 23. "Det. Fillingim located the Oncor electric records for Suspect Aubrey's business apartment on the day of the murder. There is a slight power surge at approximately 6:00 AM, then another larger surge at approximately 7:45-8:00 AM. The only explanation is that Suspect Aubrey, himself, entered the apartment." *Id.* ¶ 24.

Fillingim's statement regarding locating the Oncor electric records is a lie. Once again, such records do not exist. Plaintiff saw the fake graphs with power surges in Michael Tobolowsky's fictitious 72-page PowerPoint presentation, hereinafter referred to as ("PowerPoint"), that sparked Fillingim's interest in the cold case. Plaintiff's legal counsel tried in vain to acquire the phantom records. Oncor Electric claimed they do not have the electric records and the prosecutor, Fitzmartin, could never produce them because they did not exist. In fact, had there been such records, they would have served as exculpatory evidence for Plaintiff. The PowerPoint reflects the larger power surge, which according to Fillingim infers Plaintiff was in his apartment, occurred at the exact same time the fire was started at the Tobolowsky house. Dallas Fire-Rescue was called to the fire at 7:52 AM. If Fillingim could prove with the electric records that Plaintiff was in his apartment between 7:45-8:00 AM, he would also be proving it was impossible for Plaintiff to be responsible for the fire that began at the same time several miles away. Fillingim recklessly asserts Plaintiff was in two places at the same time.

d)   The Affidavit falsely states: **"Suspect Steven Aubrey intentionally and knowingly entered Complainant Tobolowsky's garage, assaulted Mr. Tobolowsky, doused Mr. Tobolowsky with gasoline, and set Mr. Tobolowsky on fire with a torch, which caused his death."** *Id.* ¶ 22.

Fillingim states this as a fact and this statement is egregious and false. The truth of the evidence in Fillingim's possession was that Plaintiff was never at the home of Ira Tobolowsky.

e)   The Affidavit falsely states: **"Searches of Suspect Aubrey's phone, Gmail account, and computer found various communications with Mr. Murphy. Suspect Aubrey reached out to Mr. Murphy the evening of the murder asking for legal advice about dealing with detectives. Mr. Murphy advised "high caution" talking with investigators."** *Id.* ¶ 20.

This statement is false. Fillingim tries to imply because Plaintiff was guilty and he wanted to know how to dodge the authorities. Plaintiff did contact his friend only *after* the Dallas Fire-Rescue chief had attempted to contact Plaintiff. That was not on the evening of the fire and death. After the attempted contact, Plaintiff researched online about interviews with detectives. He then reached out to his friend as he had previously been a sheriff's department employee. With the online advice and the advice of his friend, Plaintiff and Vodicka chose not to speak to authorities

f)   The Affidavit falsely states: **"Suspect Aubrey was not doing well in the court proceedings and turned his anger towards Mr. Tobolowsky. Suspect**

**Aubrey began sending anti-Semitic emails to Complainant Tobolowsky and later created bogus web pages with defamatory blogs...**" *Id.* ¶ 4.

These statements are false. Nothing supports Fillingim's claim about Plaintiff turning his anger towards Ira Tobolowsky. Plaintiff's contention with his mother did not turn anywhere or to anybody. Fillingim's fictitious and baseless claim of anger would serve as his motive for murder in this case.  Plaintiff has never sent an anti-Semitic email to anybody, including Ira Tobolowsky, and he never created bogus web pages with defamatory blogs. Fillingim's portraying Plaintiff as anti-Semetic was baseless, egregious, and false.

g) The Affidavit falsely states: **"Det. Ermatinger asked if Mr. Vodicka drinks cranberry juice, to which Mr. Vodicka says that he only drinks the Costco brand with the red cap.**" *Id.* ¶ 10.

This statement is false. Fillingim deceptively made a small change in his version of what was said to set up a later entry in his falsified Affidavit to make Vodicka appear to be untruthful and therefore unreliable as an alibi. *Id.* ¶ 18. The exact exchange between Vodicka and Det. Ermatinger during the May 19, 2016 interview is as follows:

ERMATINGER:   What brand of cranberry juice do you drink?

VODICKA:        Costco.

ERMATINGER:   What's that? Oh, Costco brand?

VODICKA:        Just the one they have at Costco. Red cap.

Vodicka never claimed he "only" drank the Costco brand nor did he claim that he had never purchased anything other than the Costco brand. When Vodicka

told the detective that he drinks Costco brand, he spoke the truth and there were six 1-gallon jugs of Costco brand cranberry juice stored in his apartment. Fillingim altered the evidence of the recorded interview. This stands as an example of Fillingim's desperation to find a crack in the case.

h) The Affidavit falsely states: **"Also in February 2016, Suspect Aubrey was written out of his inheritance, a loss of an estimated $900K - l.6 Million…"** *Id.* ¶ 5.

This statement is false. Plaintiff's litigation with his family involves the Aubrey Family Trust. Plaintiff is a named beneficiary of the Trust and he cannot be disinherited. The Trust involves millions of dollars. *See supra* footnote 2. Fillingim's false statement was hearsay information propounded by Michael Tobolowsky.

i) The Affidavit falsely states that because Plaintiff was found to be a vexatious litigant, and he was required **"to present/pay a security of $150K prior to filing new lawsuits."** *Id.* ¶ 5.

This statement is false. Plaintiff was not required to pay $150K for new lawsuits. Fillingim fabricated this to further support his false claim that Plaintiff "turned his anger towards Ira Tobolowsky." *Id.* ¶ 4.

j) The Affidavit falsely states: **"The deposition escalated to the point that Complainant Tobolowsky threatened to call the police if Suspect Aubrey and Mr. Vodicka did not leave the location."** *Id.* ¶ 7.

This statement is false. Nothing escalated during Vodicka's deposition and he and Plaintiff were happy to leave when the offer was made to reschedule for a

later date. All present were respectful and there were no threats to call the police as would be reflected in the court reporter's record. A video was taken in the deposition and Fitzmartin never produced it in response to discovery requests. Fillingim fabricated this statement to strengthen his false claim that Plaintiff "turned his anger towards Ira Tobolowsky." *Id.* ¶ 4.

k)   The Affidavit falsely states: **"During the email thread, Mr. Murphy mentioned how Suspect Aubrey had informed him about an intense hatred for the "nasty lawyer" and how Aubrey wished "he was dead", both referencing Complainant Tobolowsky."** *Id.* ¶ 20.

This statement is indisputably false. No such email exists. Fillingim fabricated this statement to materially mislead the magistrate.

l)   Fillingim checked a box in his perjured Affidavit, which attested: **"Affiant's belief is based upon the following facts and information which Affiant received from: Affiant's personal investigation of this alleged offense."** *Id.* ¶ 2.

This statement is false. Fillingim's falsified Affidavit contains fabricated and false information provided to him by Michael Tobolowsky. *See supra* ¶ 41.

**<u>Affidavit Material Omissions</u>**

a)   Fillingim's falsified Affidavit omitted material crucial exculpatory evidence that there was no access to Ira Tobolowsky's garage because the garage door was closed. When Dallas Fire-Rescue arrived at the Tobolowsky residence, DFR observed a closed garage door and the garage engulfed in fire. This fact

evidences that the fire and death was an accident and it does not explain how Plaintiff or anybody had access to the garage or Ira Tobolowsky.

b) Fillingim omitted the material fact that Dallas Fire-Rescue found a cigarette butt at the scene, bagged the evidence, and tested it for DNA. The DNA from the cigarette butt did not match Plaintiff's DNA. Ira Tobolowsky was not a smoker. Nothing tested at the crime scene matched Plaintiff's DNA. This was material exculpatory evidence and it was withheld from the magistrate.

c) The Affidavit states: **"Hours after the murder, Suspect Aubrey had gone to a scheduled dermatologist appointment at 12::30 PM to have stitches removed from his back."** *Id.* ¶ 22.

Fillingim omitted one of the most material facts in this case. The dermatologist did not observe any burn injuries on Plaintiff. All of the detectives that were part of this Investigation were determined to prove Plaintiff had burns from the fire. Their 13 falsified affidavits for search warrants used against Plaintiff and Vodicka all claimed the men were hiding from the public to conceal their burns. However, all of the affidavits, including this Affidavit, prove Plaintiff and Vodicka were not hiding from the public. Fillingim's Affidavit states Plaintiff shopped at Trader Joes approximately one hour after the fire began *Id.* ¶ 25. and it added that he went to his scheduled dermatologist appointment around noon the same day, not a strong case for hiding from public. Fillingim omitted the material exculpatory fact that the dermatologist did not observe anything resembling a burn on Plaintiff, reflected in the physician's very detailed report about the visit. One week later, Plaintiff and Vodicka were

arrested to be examined and Detectives Ermatinger and Richardson who claim they noted redness on Plaintiff's hands and arms. *Id.* ¶ 11. The opinion of a dermatologist, a medical doctor who specializes in diagnosing and treating conditions that affect skin, far outweighs the detectives' analysis on Plaintiff's skin condition and Fillingim omitted this material exculpatory evidence.

d) The Affidavit omits that the Tobolowsky family directed reconstruction of the garage before DPD Crime Scene could process the scene. In fact, the family was pulling electrical permits on the same day of the fire and death. The scene was fully contaminated and altered, preventing DPD from processing the alleged crime scene. Det. Ermatinger's May 16, 2016 Investigative Notes reflect that on the date of the fire and death, May 13, 2016, Arson Crime Scene and DPD Crime Scene had been at the location but due to the fire were restricted on processing the scene. On May 16, 2016, three days after the fire, Dallas Fire-Rescue requested assistance from DPD homicide/SIU. The detectives were shown the alleged crime scene, which was being worked on by a restoration company. The garage door had been placed in the open position, however, the opening was barricaded with sheets of plywood. The restoration company had contaminated and destroyed the entire alleged "crime" scene before DPD could process it and gather critical evidence.

e) The Affidavit states: **"Suspect Aubrey's vehicle and phone were seized to prevent destruction of evidence and to obtain a warrant."** *Id.* ¶ 11. This statement insinuates there was damning evidence contained in Plaintiff's vehicle and his phone. A forensic team dressed in hazmat suits took dozens of

swab samples from Plaintiff's vehicle. Fillingim omitted DPS's results from the extensive testing of Plaintiff's vehicle proved it was clean and had no traces of gasoline residue. DPD's tests of Plaintiff's cell phone also proved Plaintiff was never at the Tobolowsky home. Fillingim's falsified Affidavit fails to include this material exculpatory evidence.

f)   The Affidavit states: **"Also on May 19th, 2016, the Tobolowsky family found a hole drilled in their fence on the back of the property. The hole was drilled then painted over to look like a natural knot in the wood...It is believed that the hole was created to watch Mr. Tobolowsky and learn his daily routine. The height of the hole was never released."** *Id.* at ¶ 12. **"At the apartment located at 7777 Glen America, detectives seized a drill, drill bits, and paint products believed to be used in creating the hole in the Tobolowsky fence. Electronic devices were also seized and submitted to the North Texas Regional Crime Lab for analysis."** *Id.* ¶ 13.

Fillingim omitted the fact that there were multiple holes positioned a little lower in the adjoining planks of the wood fence. Fillingim omitted that the hole of their focus was 5'3" high. Plaintiff is 6'5" tall. If Plaintiff had drilled a hole in the fence, it would have been much higher to accommodate his height. Fillingim omitted the fact that the age of the hole is undetermined and could have been there for five, ten, or twenty years. Detectives seized Plaintiff's drill, at least 50 drill bits, and cans of paint primer, all sent to the forensic lab for analysis. Once again, Fillingim omitted DPD's lab results, which evidenced that the wood fibers from the drill and drill bits did not match the wood fibers

from the fence with the hole. As well, Plaintiff's paint products did not match the paint on the hole in the fence. Fillingim omitted that they were unable to find any evidence connecting Plaintiff to the hole in the fence because the results from the crime lab were in Plaintiff's favor. This is omitted material exculpatory evidence.

g) The Affidavit states: **"Dr. Eastman noted that there were areas of blanching erythema in splotchy pattern overlying both hands, wrists, and forearms. In addition, there were areas where it appeared there was no normal hair. Dr. Eastman stated that this could be consistant with healing, superficial thermal injury."** *Id.* ¶ 11.

Fillingim's Affidavit included the serious sounding medical terms "blanching erythema" and "superficial thermal injury" to mislead the magistrate, who is not a medical professional. Once defined, these terrible sounding medical conditions end up as more exculpatory evidence for Plaintiff, but Fillingim omitted the meanings of these terms. He cleverly included the medical terminology immediately after a statement with false allegations of burns on Plaintiff to insinuate his arms and hands had burns from a fire. To support the fabricated assertion that Plaintiff was burned by the fire on May 13, 2016, detectives asked Dr. Eastman to examine Plaintiff. "Blanching erythema" is a type of skin redness seen in several inflammatory skin disorders. The disorders include rosacea, sun-damaged skin, and liver disease. Plaintiff has sun-damaged skin. The doctor's note about areas where there was no normal hair is unexplainable. While Plaintiff was examined at police headquarters, a forensic

photographer took detailed photos of Plaintiff to capture evidence. The photos contradict the doctor's note about areas of no normal hair. Dr. Eastman stated that what he observed "could be consistent with healing, superficial thermal injury." A mild sunburn is an example of a "superficial thermal injury."

Fillingim intentionally omitted the next sentence in Dr. Eastman's report, which stated: "He did not have any signs of deeper thermal injury that could be found." In other words, there were no signs of anything worse that a mild sunburn. In other words, the doctor's examination/report was exculpatory evidence, known to Fillingim when at the time he executed his sworn perjured Affidavit. Also omitted from the falsified Affidavit, the material exculpatory evidence of DPD's photographs of Plaintiff .

h) The Affidavit states: **"Detectives Ermatinger and D. Richardson #6361 both noted redness that looked like a healing bum of some kind on his hands and lower arms."** *Id.* ¶ 11.

Fillingim omitted evidence of the photos of Plaintiff's hands and arms, which completely contradicts the detective's notes. There was no redness. While detectives may have included redness in their notes, pictures taken at police headquarters at the same time they observed Plaintiff's arms and hands and Plaintiff's visit to the dermatologist prove otherwise. Desperate for something to connect Plaintiff to the crime, detectives launched a bogus campaign alleging that Plaintiff had burns, irrespective of the pictures they had in their possession, evidencing that Plaintiff had no burns.

i) The Affidavit states**: "Google map searches were located for 7400 Kenshire Ln (Complainant Tobolowsky's home)..."** *Id.* ¶ 13.

This search indicates Plaintiff was stalking Ira Tobolowsky and should alarm any magistrate. Once again, Fillingim omitted a material fact about this search. The computer forensic lab results also included the date of the search. The date of Plaintiff's google map search for the address occurred *after* the fire and death of Ira Tobolowsky. Plaintiff saw news coverage on television and the story gave the address where the incident occurred. Curious about the location, Plaintiff google searched the address. That date of the search confirms that Plaintiff did not know where Ira Tobolowsky lived prior to his death. The date and time of the search is critical and this material information was withheld from the magistrate.

j) The Affidavit states: **"A search of the apartment located at 8617 Southwestern Blvd recovered propane torches and clothing belonging to Suspect Aubrey."** *Id.* ¶ 14.

Fillingim omitted to state that crime lab testing proved there was no gasoline residue on the propane tanks or Plaintiff's clothing. Plaintiff had stored in his apartment, plumbing supplies that he used in his business. It would be preposterous for a criminal to use a propane torch rather than a Bic lighter or a match to light a fire. DPD 's outlandish scenario would have Plaintiff haul gasoline in an Ocean Spray cranberry juice bottle and a heavy bulky propane tank, neither of which would fit in a pocket. As well, Plaintiff's propane tanks (used for plumbing) required use of a torch striker, a separate tool. If the torch

striker had been dropped on the way to the scene, of the crime, it would be impossible to ignite the torch. Additionally, Fitzmartin produced photos of the fence with the hole and the back gate and the photos show a pad lock on the back gate. This would indicate Plaintiff would be required to scale an 8-foot fence while lugging the gasoline, propane tank, and torch striker to gain access to the garage with a closed garage door. It is unknown if Fillingim further complicates his theory by implying Plaintiff took with him two different types of propane tanks as two types were seized. The falsified Affidavit's list of items seized from Plaintiff's home does not include the giant plastic tub full of plumbing supplies that indicates the use of the propane torches. Plaintiff had two types of propane with differing heat output for different plumbing projects. The output temperatures were as high as 3,600 degrees Fahrenheit. DPD's lab results showed no gasoline residue on the seized propane tanks and clothing, material exculpatory evidence that was knowingly or recklessly omitted from Fillingim's falsified Affidavit.

k)    The Affidavit states: "[Plaintiff] was **"ordered to pay $250K in sanctions to Betsy Aubrey"** *Id.* ¶ 5.

The first two search warrant affidavits used against Plaintiff and Vodicka in 2016, falsely stated: "Aubrey was ordered to pay Tobolowsky $550,000. The time limit for Aubrey to appeal the ruling recently expired." First, Plaintiff was ordered to pay $250,000 to his mother, not $550,000 to Ira Tobolowsky. Second, to bolster the claim that Plaintiff "turned his anger towards Mr. Tobolowsky" *Id.* ¶ 4, these falsified affidavits claimed that Plaintiff had lost his

opportunity to appeal the ruling. That was false. Plaintiff did appeal the ruling

and it was reversed. Unlike the other detectives, Fillingim did not lie in his

falsified Affidavit about Plaintiff's ability to appeal, but he omitted information

about the appeal to strengthen his fictitious anger claim. Portrayal of Plaintiff's

giant $250,000 burden was in fact Plaintiff's victory, but Fillingim omitted this

fact.[9] Fillingim had access to Texas Fifth Court of Appeals, Dallas Texas

records.

l)    The Affidavit states: "[Plaintiff] was found to be a vexatious litigant due to his

abuse of the court system." *Id.* ¶ 5.

Again, Fillingim includes this fact without full disclosure to make Plaintiff

appear problematic. Plaintiff was branded a vexatious litigant by the same

judge who abused his discretion and ordered him to pay $250,000.00 sanctions.

*See* footnote 9. The falsified Affidavit omitted that Ira Tobolowsky had

previously initiated the same vexatious litigant motion in a different state court

in a different county.[10] Following a 4-hour evidentiary hearing, that court ruled

---

[9] In the 14th Judicial District Court, Dallas County, Texas, Cause No. DC-15-11685, *Steven B. Aubrey v. Betsy S. Aubrey, Trustee*, Ira Tobolowsky's special relationship with a judge resulted in an ex parte hearing and ex parte order, which stated in part: "The Court further finds that Plaintiff should be sanctioned for bringing this lawsuit.". Confident the appellate court would reverse the trial court's frivolous order for $250,000.00 sanctions for bringing a lawsuit, Plaintiff filed his notice of appeal on April 22, 2016, approximately three weeks prior to Ira Tobolowsky's death. As expected, the court of appeals did reverse the award for sanctions and put an end to Ira Tobolowsky's unlawful defense, used in multiple litigations, where he alleged Plaintiff was not a beneficiary of his family's Trust. The Court's Opinion states in part: "On this record, we conclude that to the extent the trial court concluded appellant lacked standing respecting his claims in the underlying lawsuit, the trial court abused its discretion"; "...the trial court abused its discretion as to the amount of the sanctions awarded to Betsy."; and "We reverse the trial court's award of sanctions to Betsy in the amount of $250,000.00.*See Steven B. Aubrey v. Betsy S. Aubrey, Trustee.*, No. 05-16-00506-CV (Tex. App.—Dallas June 7, 2017)

[10] *See* The 353rd Judicial District Court, Travis County, Texas, Cause No. D-1-GN-15-003836, *Steven B. Aubrey v. United Heritage Credit Union, et al.*

Plaintiff was not a vexatious litigant. Just 28 days later, Ira Tobolowsky forum shopped the same motion into his court of favor and obtained the ex parte order that determined Plaintiff was a vexatious litigant, contradicting the first ruling.

## Affidavit Misleading Statements

a)    The Affidavit states: **"The clothing was submitted to the Southwestern Institute of Forensic Sciences for testing. The clothing returned with ignitable liquid residue 2-ethyl-1-1-hexanol. The evidence supervisor later informed Det. B. Fillingim #9779 that the amount of liquid residue was substantially higher than expected or previously seen."** *Id.* ¶ 14.

Fillingim included these statements in his Affidavit to intentionally mislead the magistrate. His inclusion of "2-ethyl-1-1-hexanol" in the falsified Affidavit is a red herring. The exotic sounding chemical, 2-ethyl-1-1-hexanol, has absolutely no relevance or connection to a fire investigation. Fillingim had already attested that "an Ocean Spray cranberry juice bottle containing gasoline was located in the garage" and that the deceased had been doused with gasoline. *Id.* ¶ 8. DPD tested Plaintiff's clothes in 2016, and unlike Fillingim, the other detectives who worked on this case had no interest in the irrelevant chemical, 2-ethyl-1-1-hexanol.[11] Ira Tobolowsky was not doused with perfume and then set on fire. Fillingim intentionally omitted that Plaintiff's clothes did not test

---

[11] ScienceDirect.com's July 2010 review, "Fragrance material review on 2-ethyl-1-hexanol" exposes the irrelevance as follows: "2-Ethyl-1-hexanol is a fragrance ingredient used in cosmetics, fine fragrances, shampoos, toilet soaps and other toiletries as well as in non-cosmetic products such as household cleaners and detergents. It is a colorless, oily liquid with mild, sweet and slightly floral-rosy odor of considerable tenacity (Arctander, 1969). This material has been reported to occur in nature, with highest quantities observed in tea (VCF, 2009)." This review is accessed at: https://www.science direct.com/science /article/abs/pii/S0278691510003182

positive for gasoline residue, material exculpatory evidence. Fillingim's inclusion of 2-ethyl-1-1-hexanol was malicious trickery.

b) The Affidavit states: **"While looking over the crime scene photographs taken during the search of apartment located at 7777 Glen America, Det. Fillingim noticed a book on the nightstand titled 'Future Crimes', written by Marc Goodman." "It is believed that Suspect Aubrey utilized this book to educate himself and turn off various apps that could track his movements or simply left his phone at home during the commission of the murder."** *Id.* ¶ 17.

The book, Future Crimes, is about internet crimes, making it completely irrelevant to this Investigation. The photo of Vodicka's bedside table reflects that the book sitting on top Future Crime was Rev. Billy Graham's book titled "Angels." It too is completely irrelevant to the Investigation. Rather than accept the exculpatory evidence on its face, that Plaintiff's phone was home with Plaintiff when the fire and death occurred, Fillingim manufactured an unbelievable story about Plaintiff reading books about internet crimes as a source to learn about arson/murder. Additionally, Fillingim falsely stated he was looking at "crime scene photographs." *Id.* ¶ 17. Plaintiff and Vodicka's apartment was not a crime scene. Fillingim saw a picture of the book titled "Future Crimes" on Vodicka's bedside table, because it was Vodicka's book. Obviously, the book title indicates its subject is about internet crime. Specifically, the book details how criminals, corporations, and even countries are using new and emerging technologies against you. Nonetheless, Fillingim,

grasping at straws, ordered the irrelevant book and read it. After reading the book, he realized it was not a book about how to get away with arson/murder. In truth, Plaintiff has read any part of the book and has never opened the book's cover. Fillingim's outlandish theory and gross speculation had no place in a sworn arrest warrant affidavit.

c) The Affidavit states: **"Det. Fillingim discovered an email thread between Suspect Aubrey and the author of the D Magazine article, Jamie Thompson, while she was gathering information for her story. During the exchange, Suspect Aubrey made a reference to the height of the hole in the fence. Suspect Aubrey was familiar with the height even though it had never been released publicly in any form."** *Id.* ¶ 21.

This statement falsely infers that the only way Plaintiff could have knowledge about the hole in the fence is if he had personally been there. Fillingim did not know that in July 2016, Det. Sayers had told Plaintiff's legal counsel, Phillip Hayes, about the height of the hole and that information was shared with Plaintiff and Vodicka. Phillip Hayes was prepared to testify to this fact.

d) The Affidavit states: **"During the conversation, Mr. Vodicka advised Det. Ermatinger to look at the phone tower ping locations three times, something not commonly said by citizens during police interviews."** *Id.* ¶ 10.

This statement insinuates that Vodicka had extraordinary knowledge regarding the pinging of cell phones towers. Vodicka's knowledge is common among people who watch True Crime television shows like Dateline, which he did.

True Crime shows feature phone GPS and tower pings on nearly every episode as that is where all investigations seem to begin.

e)   The Affidavit states: **"Det. Fillingim obtained Suspect Aubrey's Google voice text messages which were used for his massage business." "Suspect Aubrey explains in other texts his reasoning for moving to Florida, which is that previous investigators lied on affidavits and that the media was out to destroy him. None of his texts include any type of denial statement regarding the murder."** *Id.* ¶ 26.

After the media began publishing defamatory stories about Plaintiff, some of Plaintiff's clients reached out to him to assure Plaintiff that they knew he was innocent of any wrongdoing. Plaintiff felt obligated to explain them that he would be moving to Florida and would no longer see them, but did not deem it was necessary to proclaim his innocence as none of the clients questioned it. In fact, Plaintiff made very public denial statements regarding the alleged murder with the media and in court filings. Plaintiff felt no need to convince friends and clients of his innocence because they never questioned it.

f)   The Affidavit states: **"Det. Fillingim obtained the Trader Joe's receipt from when Suspect Aubrey went grocery shopping. While the receipt does show the sale was made at 9:23 AM, Suspect Aubrey only spent $8.97 and purchased 2 packages of Roma tomato salsa bruschetta and ciabatta bread."** *Id.* ¶ 25.

Fillingim's inclusion of Plaintiff's grocery shopping habits to support probable cause for arson/murder is baffling. Fillingim 's apparent connection between

the purchase of Roma tomato salsa and Ciabatta bread with an arson/murder is baffling. Trader Joes is a very public place. Plaintiff's patronage there provides material exculpatory evidence that Plaintiff was not hiding from public places. Trader Joes happened to be directly across the street from Plaintiff's apartment. Plaintiff would occasionally stop by the store for just a gallon of milk, which costs even less than $8.97.

g) The Affidavit states: **"Det. Fillingim utilized credit card statements for Suspect Aubrey and Mr. Vodicka to log dining habits from February-May, the time they moved to Dallas until the murder. These are only verified by credit card transactions and do not account for cash purchases" "There were occasional trips to El Fenix and Snuffers, plus 1 meal at Maggianos for $57.30, and 1 meal at Pappadeaux for $54.25. The evening of the murder, Mr. Vodicka calls and makes a reservation under Suspect Aubrey's name at Lawry's Prime Rib. Suspect Aubrey and Mr. Vodicka go to their reservation the day after the murder, May 14, and spend $146.1, almost triple what they had previously spent at any restaurant in the last 4 months."** *Id.* ¶ 27.

First, Fillingim attempted to support probable cause for arson/murder based on Plaintiff's trip to the grocery store and here, he analyzes the dining habits of Plaintiff and Vodicka in of support an arrest warrant. Fillingim's falsified Affidavit is proposing that a Saturday night steak dinner one day after Ira Tobolowsky's death is somehow indicates arson and murder the day before. If Plaintiff and Vodicka had instead made a reservation for the following day,

Sunday, or two day later on Monday, what would that indicate? This information goes to the top of the irrelevance list.

h)    The Affidavit states: **"Det. Fillingim also observed a photo of Suspect Aubrey and Mr. Vodickas pantry which contains a bottle of Kroger brand cranberry juice. That juice bottle has a white cap and disproves Mr. Vodickas claim that they only drink Costco brand juice with the red cap."** *Id.* ¶ 18.

As Fillingim's falsified Affidavit admits, an Ocean Spray cranberry juice bottle that was found with gasoline at the scene of the fire, which is further exculpatory evidence. However, Fillingim spins this to allege Vodicka's claim is inconsistent with the truth. Vodicka does not and did not lie. Vodicka never claimed he and Plaintiff "only" drank Costco brand juice. When he was interviewed, six 1-gallon jugs of Costco brand juice were stored in their apartment. The bottle of Kroger brand cranberry juice was empty and used by Plaintiff to mix a supplement drink that he would take to the gym. Moreover, the bottle of juice with gasoline found at the scene of the fire was Ocean Spray. Fillingim's evidence that an Ocean Spray juice bottle was found at the scene of the fire does not lend any meaning to the evidence of Costco or Kroger juices bottles in Plaintiff's apartment.

i)    The Affidavit comically states: **"Due to the overwhelming amount of evidence collected on this case, not all case details have been included in this report."** *Id.* ¶ 29.

This statement was ridiculously false. Fillingim lost his mind by the time he was finishing his perjured Affidavit.  Following six years of investigation that included 13 search warrants issued against Plaintiff, Vodicka, and their property, there was absolutely zero evidence connecting them to the fire or death of Ira Tobolowsky. Fillingim oddly states that he could not fit all of the evidence in his Affidavit. In his 2020 Declaration, Det. Ermatinger stated under oath "as a result of this sprawling investigation there is not enough evidence to prosecute anyone for the murder of Ira Tobolowsky." *See supra* ¶ 39. In 2021, Fillingim began his unconventional investigation of this case. He watched Michael Tobolowsky's PowerPoint, read a book about future internet crimes, analyzed Plaintiff's grocery store purchases, analyzed Plaintiff's dining habits, and now falsely claims there is an "overwhelming amount of evidence collected on this case." Proving Fillingim's statement was categorically false, Fitzmartin, dismissed the charges against Plaintiff, stating: "the State is unable to make a prima facie case at this time."

j)  The Affidavit states: **"Text messages on Suspect Aubrey's phone show that he texted a longtime friend, Alejandro 'Yente' Juaristi, on May 13th, at 7:36 PM, that Complainant Tobolowsky had died. Mr. Juaristi responded by telling Suspect Aubrey that he hopes he has his alibi ready."** *Id.* ¶ 19.
Fillingim knew or should have known this was an off-handed text from Plaintiff's friend who has a twisted sense of humor. It is irrelevant and indicates nothing. Fillingim included the text to infer that Plaintiff's friend had prior knowledge of Plaintiff committing a crime. Fillingim had in his

possession thousands of Plaintiff's texts prior to this May 13 text and none reflect any discussion with friends about future crime or crime related to Ira Tobolowsky.

k) The Affidavit states: **"Suspect Aubrey shared a news story to Mr. Murphy, to which Mr. Murphy responded that Suspect Aubrey 'took it to a whole nother level when ya dun threw gas on his ass and torched the motherfucker.' A document in Suspect Aubrey's computer was found appearing to be from Mr. Murphy which he tells Suspect Aubrey to 'keep me abreast of developments, and don't kill anyone...again.'"** *Id.* ¶ 20.

Fillingim's includes this irrelevant email attempting to impute significance to the statement "don't kill anybody…again." This email is clearly just an absurd, not so funny, response to the news story Plaintiff's friend reviewed. Fillingim had the history of email between Plaintiff and his friend and there was nothing to indicate Plaintiff or his friend had knowledge of a crime before it happened.

l) The Affidavit states: **"Det. Fillingim reached out to Ed Nordskog, a renowned fire death scene expert, criminal profiler, and case analyst." "Mr. Nordskog's report notes a burn anomaly on Complainant Tobolowsky's left thigh that does not match the fuel packages and fire progression at the crime scene. Mr. Nordskog stated that this anomaly is consistent with the results of a torch on the skin. It was Mr. Nordskogs opinion that the use of a torch could create a wound consistent with that which was on Complainant Tobolowsky's inner thigh."** *Id.* ¶ 28.

The case was six years old at the time Fillingim drafted his falsified Affidavit and of the many experts that examined the same materials, none had opinions that included a torch. Fillingim reached out to Mr. Nordskogs and asked him to consider including a torch in his report. Mr. Nordskogs stated that use of a torch "could" possibly create a wound found on the inner thigh of the deceased to satisfy Fillingim's desire to include a torch. Torch wounds on human flesh is an extraordinarily narrow field of expertise. It would be helpful to know how many flesh wounds from torches Mr. Nordskogs had previously examined.

The falsified Affidavit states that "Suspect Aubrey then doused Complainant Tobolowsky with gasoline and set him on fire, which caused Mr. Tobolowsky's death." *Id.* ¶ 8.

Fillingim's concocted theory suggests that someone covered Ira Tobolowsky with gasoline and held a torch to his inner thigh, which ignited the fire and consumed Ira Tobolowsky and the perpetrator in flames. This scenario suggests a suicide mission to ensure Ira Tobolowsky's inner thigh was burned. Fillingim's suggestion that someone hauled gasoline and a big heavy torch instead of a Bic lighter or a match to ignite a fire is nonsensical.

50.     Fillingim's perjured Affidavit is proof that his investigation into the death of Ira Tobolowsky was an abject failure. He was unable to discover anything that resembled evidence or probable cause. Fillingim's Plan B was to manufacture a perjured affidavit with material lies, false misleading statements, omissions of material exculpatory evidence and present it to magistrate to secure an arrest warrant. Plan B violated the Brady rule and other laws. Fillingim's misleading statements and omissions were made with reckless disregard for the truth.

51.     Fillingim's reliance on Michael Tobolowsky's false PowerPoint, reading of books about internet crimes, study and analysis of Plaintiff's grocery shopping, and analysis of Plaintiff's dining habits did not prove beneficial to the Investigation and clearly his unusual methodology could not provide the magistrate a basis for a finding of probable cause. Rather than give up on the no-evidence case, as all detectives had done before him, Fillingim resorted to perjury, deception, and omission in support of a warrant, depriving the magistrate accurate information necessary to exercise her informed judgment.

52.     On April 27, 2022, Fillingim's unlawful conduct caused the false arrest of Plaintiff. Woken from his sleep with pounding at the front door of his home, Plaintiff opened the door to find several law enforcement officers with firearms pointing to Plaintiff. Dressed only in his boxers, Plaintiff was placed in handcuffs and escorted to one of the many sheriff's vehicles that blocked the entire street. Fillingim was present with another DPD officer. This event has permanently injured Plaintiff so that every time there is a knock at the door, Plaintiff freezes and experiences post-traumatic stress disorder. Dallas County jail psychiatrists prescribed Plaintiff psychiatric medication to address his side effects of post-traumatic stress disorder.

**D.   Fillingim's Perjured Testimony to the Grand Jury**

53.     Soon after Fillingim intentionally deceived the magistrate, causing an arrest warrant for Plaintiff to be issued, he appeared before the Dallas County grand jury.

54.     Fillingim swore, under oath and penalty of perjury, to tell the truth—the whole truth, and nothing but the truth, meaning he should tell the truth as accurately as humanly possible and not leave out material exculpatory evidence, but that is not what he did.

55.     Considering his success in obtaining the arrest warrant using a perjured affidavit, Fillingim relied on the same methods to pursue Plaintiff's indictment.

56.     The six-year-old case had no evidence when Fillingim presented his perjured Affidavit to the magistrate on April 25, 2022, and when he testified before the grand jury the following month, the case remained void of any evidence. Nonetheless, whatever Fillingim said during the grand jury proceeding, combined with the things he did not say, caused the indictment of Plaintiff with the offense: "CAPITAL MURDER BY TERROR THREAT/OTHER FELONY." The Indictment is attached as **Exhibit B**. Fillingim was the only witness at the proceeding and the grand jury's decision to indict Plaintiff relied solely on Fillingim's perjured testimony.

57.     Shockingly, the Indictment included three capital murder charges. It had three inexplicable specific aggravating circumstances that elevated the standard murder charge to three capital murder charges: Capital Murder/Terror Threat; Capital Murder/Arson; and Capital Murder/Burglary. Clearly, the copious perjury in Fillingim's Affidavit paled in comparison to the perjury in his testimony before grand jury. The Affidavit did not contain manufactured facts about a terror threat, arson, and burglary.

58.     During Plaintiff's 625 days of incarceration, waiting for his trial, he was given the opportunity to read the transcript of Fillingim's testimony before the grand jury. The State's prosecutor, Fitzmartin, had produced the transcript to Plaintiff's legal counsel as part of the capital murder case discovery. Plaintiff was only able to review the document one time, in 2023, during a visit to the jail from one of his legal team. With a wall of glass between them, Plaintiff reviewed the transcript of Fillingim's perjured testimony.

59.     Plaintiff recalls Fillingim's testimony included many of the same lies that he used in his Affidavit. Plaintiff also remembers that the abundance of material Brady evidence in this case was completely vacant in his testimony, like it was in his perjured Affidavit.

Fillingim's grand jury testimony omitted all material exculpatory evidence including, but not limited to, the following:

a) Plaintiff incorporates Section C (a) at p. 18 as if fully stated herein.

b) Plaintiff incorporates Section C (b) at p. 19 as if fully stated herein.

c) Plaintiff incorporates Section C (c) at p. 19 as if fully stated herein.

d) Plaintiff incorporates Section C (d) at p. 20 as if fully stated herein.

e) Plaintiff incorporates Section C (e) at p. 20 as if fully stated herein.

f) Plaintiff incorporates Section C (f) at p. 21 as if fully stated herein.

g) Plaintiff incorporates Section C (g) at p. 22 as if fully stated herein.

h) Plaintiff incorporates Section C (h) at p. 23 as if fully stated herein.

i) Plaintiff incorporates Section C (i) at p. 24 as if fully stated herein.

j) Plaintiff incorporates Section C (j) at p. 24 as if fully stated herein.

k) Plaintiff incorporates Section C (k) at p. 25 as if fully stated herein.

l) Plaintiff incorporates Section C (l) at p. 26 as if fully stated herein.

60.    In Texas, Plaintiff was able to view discovery but was not permitted to have a copy of the discovery due to the legal restraints imposed by the Michael Morton Act and a court's order is required to obtain a copy of Fillingim's grand jury transcript.[12]

---

[12] Discovery rights in criminal cases is governed by Article 39.14 of the Texas Code of Criminal Procedure. This is also referred to as the Michael Morton Act. Texas Code of Criminal Procedure Art. 39.14(e)(1) states: Except as provided by Subsection (f), the defendant, the attorney representing the defendant, or an investigator, expert, consulting legal counsel, or other agent of the attorney representing the defendant may not disclose to a third party any documents, evidence, materials, or witness statements received from the state under this article unless a court orders the disclosure upon a showing of good cause after notice and hearing after considering the security and privacy interests of any victim or witness.

61.     Upon receipt of the transcript, Plaintiff can address with particularity all material lies, omissions, and misleading statements Fillingim used to mislead the grand jury in support of the indictment of Plaintiff. Without the transcript, the indictment reflects some of the material lies Fillingim included in his sworn testimony, including:

a)  "That **STEVEN BENTON AUBREY,** hereinafter called Defendant, did unlawfully then and there intentionally cause the death of IRA TOBOLOWSKY, an individual, hereinafter called deceased, by: SETTING THE DECEASED ON FIRE AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: FIRE, AND AN IGNITABLE LIQUID, AND SMOKE, AND BY INFLICTING BLUNT FORCE INJURY TO THE DECEASED AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: HIS HANDS, AND THE GROUND, AND AN UNKNOWN OBJECT, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY, and the defendant was then and there in the course of committing and attempting to commit the offense of ARSON."

This sworn testimony is false in its entirety. First, Plaintiff did not cause the death of Ira Tobolowsky. Second, Plaintiff did not set the deceased on fire. Third, Plaintiff did not use fire, an ignitable liquid, and smoke at the Tobolowsky home. Fourth, Plaintiff did not inflict blunt force injury on Ira Tobolowsky with his hands, the ground, and an object. Fifth, Plaintiff was not committing or attempting to commit arson. Fillingim had absolutely no evidence to indicate any of these false claims. There was no evidence connecting Plaintiff to the location of the fire and mountains of exculpatory evidence that additionally reflects he was never present at the Tobolowsky home. Plaintiff did not know where Ira Tobolowsky lived until he saw a news story after the fire and death, reflected by the date of the google search for

the address. When Dallas Fire-Rescue arrived at the residence, the garage door was closed, indicating the fire could not have been caused by anybody outside the garage.

b) The falsified Indictment further states:

"and the defendant was then and there in the course of committing and attempting to commit the offense of BURGLARY of said deceased."

The statement is false. Plaintiff was not present at the location and did not enter the garage of Ira Tobolowsky. Fillingim had no evidence to suggest Plaintiff was in the garage or that anybody other than Ira Tobolowsky was in the garage when the fire began. The garage door was closed making it impossible for anyone to enter the premises. Furthermore, the statute of limitations for the burglary as cited in the Indictment is five years. The date of the homicide is alleged to be May 13, 2016; the date the Indictment was filed is May 19, 2022. Thus, the time allowed for the burglary charged in the Indictment had run.

62.     Upon information and belief, Fitzmartin was the state's attorney responsible for drafting the falsified indictment. Upon information and belief, Fitzmartin's involvement in the grand jury proceeding is proof that he was fully aware that this case had no evidence. The grand jury did not indict Plaintiff in 2016, and the case remained void of evidence six years later when Fillingim gave his perjured testimony.

E. **Fitzmartin Deprived Plaintiff his Liberty for 600 Days**

63.     Fitzmartin served as the state's prosecutor in *The State of Texas v. Steven Aubrey.* Upon information and belief, Fitzmartin orchestrated the grand jury proceeding that resulted in Plaintiff's indictment, filed May 19, 2022.

64.     It was Fitzmartin's responsibility is to advise the grand jury on the law and to present evidence for its consideration. In discharging these responsibilities, Fitzmartin was required to be fair to all witnesses and not do anything to inflame or otherwise improperly influence the grand jurors.

65.     The grand jurors could only see and hear what Fitzmartin put before them. Fitzmartin had an obligation to divulge exculpatory evidence if the evidence raised a reasonable doubt of Plaintiff's guilt that would not exist without the evidence. It is abundantly clear that Fitzmartin ignored his obligation to present exculpatory evidence, which influenced the grand jurors' decision to indict. Plaintiff incorporates all material exculpatory evidence specified in Section C (a) – (l) at pp. 18-27, as if fully stated herein.

66.     Fitzmartin chose to present whatever evidence was required to obtain a grand jury indictment. He had an agreement with Fillingim, who perjured himself in support of the indictment of Plaintiff. Plaintiff's review of the transcript revealed that all exculpatory evidence, material and otherwise, was excluded from Fillingim's testimony.

67.     Fitzmartin and Fillingim's one-sided presentation that turned into an indictment, violated Plaintiff's Fourth Amendment right to be protected from unreasonable searches and seizures by the government.

68.     Fitzmartin acted under color of law when he willfully and maliciously deprived Plaintiff his right to be protected by the Constitution, causing Plaintiff's incarceration for more

than 600 days. Fitzmartin knew or should have known that there was a lack of probable cause in grand jury proceeding because Fitzmartin himself later filed a motion to dismiss the case stating: "the State is unable to make a prima facie case at this time."

69.     As a state prosecutor, Fitzmartin had the privilege of choosing cases to present to the grand jury. Therefore, he would choose cases that would likely result in convictions, setting himself up for success. Plaintiff's case was not one of those and it was so completely void of evidence that Fitzmartin asked for its dismissal, which raises the question of why he chose to pursue it in the first place.

70.     Upon information and belief, Fitzmartin began to violate Plaintiff's Fourth Amendment rights when he presented sham evidence to the grand jury that indicted Plaintiff in May 2022. At the very latest, Fitzmartin had adopted and ratified Fillingim's perjured Affidavit by December 1, 2022, the date of Plaintiff's bond hearing.

71.     At Plaintiff's bond hearing, Fitzmartin demonstrated his depth of knowledge surrounding Fillingim's perjured Affidavit and he willfully and maliciously argued the importance of Plaintiff's continued incarceration. At the December 1, 2022 Bond Hearing, Fitzmartin stated:

> "Mr. Aubrey committed a vicious, violent crime here in Dallas..." "You have the probable cause in front of you." "The circumstances behind this crime, the citizens of Dallas need to be kept safe and we need to make sure Mr. Aubrey stays here." "I would ask the Court to keep it at 2 million dollars so we can have this case see through to disposition."

The judge presiding over the bond hearing stated the Court was going to take a 15-minute recess. Fitzmartin left the court room at the same time the judge left. Fifteen minutes later, Fitzmartin returned to the court room at the same time the judge returned. The judge denied

Plaintiff's motion for bond reduction, leaving the outrageous and excessive $2 million bond in place. Approximately 30 members of the Tobolowsky clan were present at the hearing to pressure Fitzmartin and the judge to keep Plaintiff incarcerated.

72.     At least by December 1, 2022, Fitzmartin had already produced to Plaintiff's attorneys all of Plaintiff's exculpatory evidence. If not in May 2022, then at least by December 1, 2022, Fitzmartin intentionally and recklessly continued his unlawful prosecution and incarceration of Plaintiff, despite his knowledge of the following:  a) the DNA collected at the scene did not match Plaintiff's DNA; b) the garage door at the scene of the fire was closed; c) DPD photos prove Plaintiff was not burned; d) there was no call from Plaintiff's dermatologist about laser treatments; e) wood fibers on Plaintiff's drill and drill bits did not match those on the fence with the hole; f) the paint on the hole in the fence did not match paint seized from Plaintiff's apartment; g) Plaintiff's google search for Kenshire Lane occurred *after* the fire; and h) all other material exculpatory evidence.

73.     Plaintiff spent an excruciating 625 days in jail as a result of Fitzmartin's unlawful and continuous false imprisonment. Whenever Plaintiff was moved from his cell, he was restrained with handcuffs causing Plaintiff anxiety and sleep disorders.

74.     Plaintiff's severe depression and anxiety resulted in Dallas County jail staff placing him in jail's suicide watch unit on two occasions. Plaintiff was monitored by psychiatric professionals.

## F. **Fry Deprived Plaintiff his Right to a Writ of Habeas Corpus Hearing**

75.     On May 26, 2022, in a Broward County court, Plaintiff advised that he was innocent and refused to waive extradition. Fry served as a county court judge for Broward County and he presided over Plaintiff's case, the *State of Florida vs. Steven Benton Aubrey*.

76.     Fry denied Plaintiff his fundamental constitutional right to access and use the court system. This right is based on the First, Fifth and Fourteenth Amendments to the Constitution. Under the First Amendment, Plaintiff has the right to "petition the government for a redress of grievances," and under the Fifth and Fourteenth Amendments, he has a right to "due process of law." Together, these provisions guarantee that Plaintiff must be given the opportunity to go to court if he thinks his rights have been violated.

77.     Fry violated Plaintiff's right to be heard under the Fourteenth Amendment due process clause known as procedural due process.

78.     Plaintiff had independent rights under the United States, Florida, and Texas Constitutions to test the legality of his arrest.

79.     Under Fla. Stat. 941.01–941.42, Plaintiff was guaranteed a habeas corpus hearing and the accompanying right to present evidence against the validity of the extradition warrant.

80.     Plaintiff had a fundamental right in the Constitution to a writ of habeas corpus, protecting him against unlawful and indefinite imprisonment.

81.     Initially, Fry agreed with Plaintiff's request to set a hearing for Plaintiff's Motion for Writ of Habeas Corpus to be heard, honoring Plaintiff's constitutional right and Fry's duty as a judge.

82.     While incarcerated in Broward County jail, Plaintiff was restrained in handcuffs and shackles when attending hearings in Fry's courtroom. Wearing the black stripped jumper and shuffling into the courtroom was traumatic for Plaintiff. For 61 years, Plaintiff had a perfectly clean record and had never spent a night in jail. Due to Fry's need for excessive security, Plaintiff was suited up like Hannibal Lecter and paraded into his courtroom in front of

family and friends.   Fry's demand for Plaintiff to be present at hearings was mortifying and humiliating and has caused Plaintiff much anxiety as a result.

83.     Plaintiff experienced severe depression and he was placed in the Broward County jail suicide watch unit to be monitored by a psychiatric professional.

84.     On July 9, 2022, Fry filed a Notice of Court Date, setting an August 18, 2022 hearing for Plaintiff's Motion for Writ of Habeas Corpus, hereinafter referred to as ("Writ").

85.     On July 26, 2022, Fry held a status conference hearing for Plaintiff's case. Fry began the hearing by stating that he had spoken with Michael Tobolowsky, admitting they had an ex parte communication. After making that statement, Fry was suddenly contentious with Plaintiff and combative regarding Plaintiff's scheduled upcoming habeas corpus hearing. He said he only would consider the legal sufficiency of the extradition documents and would not consider probable cause or the legality of his arrest. Fry then ordered another status conference hearing to be held two days later, on July 28, 2022.

86.     Contradicting case law precedent, Fry moved the goal post to cripple Plaintiff's ability to prevail at the upcoming hearing. The Fourth Amendment to the United States requires that in matters involving extradition, probable cause must be determined by the paperwork sent by the requesting State to support extradition.

> "In the case at bar, there is no indictment or document reflecting a prior judicial determination of probable cause. The Arizona complaint and arrest warrant are both phrased in conclusory language which simply mirrors the language of the pertinent Arizona statutes. More importantly, the two supporting affidavits fail to set out facts which could justify a Fourth Amendment finding of probable cause for charging [Doran] with a crime." *Michigan v. Doran,* 439 U.S. 282 (1978)

87.     On July 28, 2022, Fry held another status conference hearing. Plaintiff's attorney spoke for 10 minutes or less about the insufficiency of the extradition documents and requested

a hearing on Plaintiff's Writ. Fry stated that he would not conduct hearing on Plaintiff's Writ and he issued an Order denying Plaintiff's Writ. In other words, Fry's actions violated Plaintiff's Fourteenth Amendment right, depriving him of life and liberty without due process of law.

88.     Upon information and belief, Fry reached an agreement with Michael Tobolowsky, during one of their ex parte meetings, to cancel the scheduled hearing for Plaintiff's Writ, rule against Plaintiff, and get Plaintiff back to Texas as soon as possible.

89.     There was no evidentiary hearing on August 18, as Fry had promised and scheduled. Fry's July 28, 2022 Order that denied habeas corpus relief incorporated misleading information to make it appear as though he had conducted a hearing. The Order states: "The defendant Steven Aubrey's Writ is hereby denied after extensive review of the Governor Warrant served upon the defendant and extensive argument from the defendants attorney."

90.     Not only was it abundantly clear that Fry had not reviewed the writ, he did not permit Plaintiff's attorney to argue the legality of Plaintiff's arrest and detention. In no way could the presentation by Plaintiff's attorney that was cut short be described as an "extensive argument." Fry manufactured the Order to appear that he conducted a hearing on Plaintiff's Motion for Writ. He did not.

91.     In addition to violating Plaintiff's rights under the U.S. Constitution, Fry violated Plaintiff's rights under Fla. Stat. 941.10, which mandates Plaintiff's right to test the legality of the arrest and his right to apply for a writ of habeas corpus. Fry denied Plaintiff these rights under Florida law.

92.     Fla. Stat. 941.11 titled Penalty for noncompliance with Fla. Stat. 941.10 is directed at Fry. It mandates that any officer who shall deliver to the agent for extradition of the demanding state a person in his or her custody under the Governor's warrant, in willful

disobedience to Fla. Stat. 941.10, shall be guilty of a misdemeanor of the second degree, punishable of imprisonment not exceeding 60 days. Fry's willful disobedience under Fla. Stat. 941.11 was evidenced on July 28, 2016, when he read Fla. Stat. 941.10 verbatim in open court. This proves Fry's knowledge beforehand that minutes later he was going to commit a criminal act when he denied Plaintiff his right to test the legality of his arrest pursuant to Fla. Stat. 941.10.

93.     When Fry denied Plaintiff his right to test the legality of the arrest and he denied Plaintiff his right to apply for a writ of habeas corpus, he did willfully disobey § 941.10, which was a criminal act. Fry stabbed Plaintiff in the back when he denied Plaintiff his right to be heard in court. Though Fry had promised and scheduled a hearing for Plaintiff's Writ, Fry issued an order that denied it. Plaintiff never expected to be the victim of a criminal act perpetrated by Fry.

94.     As a county judge, Fry enjoys absolute immunity from suits involving judicial acts performed within the jurisdiction of his court. However, absolute immunity is not extended to Fry's acts that are in clear absence of all jurisdiction and no court has jurisdiction to commit crimes. Fry waived his absolute judicial immunity when he knowingly and willfully committed a criminal act against Plaintiff.

95.     The effects of Fry's ex parte meetings with the Tobolowsky family changed the course of Plaintiff's case and likely caused Fry to commit a criminal act and lose his absolute immunity as a judge.

96.     Plaintiff spent 126 days in the Broward County jail, hopeful that Fry's court would correct the wrong emanating from Fillingim's perjured Affidavit. Like Fillingim and

Fitzmartin, Fry was compliant with the desecration of Plaintiff's rights under the U.S. Constitution and Florida state law.

97.     On August 31, 2022, Plaintiff was extradited to Texas. After many months of incarceration, which severely damaged Plaintiff, the proceedings were terminated in Plaintiff's favor. Fitzmartin ultimately dismissed the egregious capital murder charges, admitting the state did not have a prima facia case against Plaintiff

### G.  Michael Tobolowsky, Private Citizen, Puppeteer

98.     The Tobolowsky family is one of the most powerful in the legal profession in Texas, with dozens of attorneys and judges scattered at all levels throughout the state.

99.     At the time of his death, Ira Tobolowsky was personally involved in at least three multiyear legal cases involving vast sums of money. The first was over control of a patent worth millions of dollars. The second involved a long-open estate linking Debbie Tobolowsky, Ira Tobolowsky, and the Zale family. A third would lead to a federal investigation and indictment. In that case, a real estate investor had named one of Ira Tobolowsky's longtime companies, Apartment Maintenance Services, as an Accused in a fraudulent mortgage Ponzi scheme. This case was filed just three weeks before Ira Tobolowsky's death. These offer a mere glimpse of Ira Tobolowsky's business interests and civil practice. For example, for years Ira Tobolowsky was a lobbyist and representative of gambling interests in the state of Texas. The DPD did not investigate any of these connections, possibly at someone's direction.

100.    While many believe Ira Tobolowsky's death was an accident, days after the fire and death, his close friend and confidant, Robert Hinton, said in his interview on NBC's "Today": "This was a hit. There's no question in my mind, this was a hit. It just had to be

criminal. It was disguised as fire to cover up his murder." Mr. Hinton suggests that he knows something extra about Ira Tobolowsky's shadowy business associations and vulnerabilities.

### Michael Influence

101.    Michael Tobolowsky, hereinafter referred to as ("Michael") is the son of Ira Tobolowsky. Though he is a private citizen, Michael's fingerprints have been all over the investigation of Plaintiff since May 2016. His corruptly influences the Dallas City Counsel, the DPD, the media, and the judiciary.

102.    Michael, a private citizen, was in *de facto* control of the Investigation. His involvement was so enmeshed with the Investigation that the presiding state court judge in the case determined Michael was party to the state's investigation. He was ordered to appear before the Court to bring all relevant documents to a hearing and give pretrial testimony so that state would remain in compliance with the Brady rule. Pretrial testimony by private citizens is extremely rare.[13]

103.    Michael had been instrumental in finding and creating opportunities to spark new interest in what had become his father's cold case. For example, in October 2016, Michael concocted a scheme to have Plaintiff arrested for prostitution while his enlisted thugs worked with DPD detectives to terrorize Vodicka. *See supra* ¶¶ 37-39.

104.    Plaintiff had reviewed the falsified PowerPoint that Michael manufactured to spark interest in the new homicide detective, Fillingim. Fillingim agreed to work with Michael as did the detectives who previously had been a part of the investigation into the fire and death of Ira Tobolowsky.

---

[13] Michael's two armed thugs, who committed aggravated assaults on Plaintiff and Vodicka, were also ordered to give pretrial testimony. One went in hiding and could not be found. The other, Leigh Allen, was ordered to testify twice.

105.    The false information contained in Michael's PowerPoint is also contained in Fillingim's perjured Affidavit that caused the arrest of Plaintiff.

106.    Fitzmartin produced Michael's falsified PowerPoint in response to discovery requests in Plaintiff's criminal case.

107.    Upon information and belief, Fitzmartin had an agreement with Michael and Fillingim to pursue the prosecution of Plaintiff even though they had no evidence connecting him with the fire or Ira Tobolowsky's death.

108.    Approximately 30 members of the Tobolowsky clan were present at Plaintiff's December 12, 2022 bond hearing to influence Fitzmartin and the judge's ruling. They wanted to punish Plaintiff as long as possible prior to the trial because they knew the conviction of Plaintiff was a long shot. *See supra* ¶71.

109.    Ultimately, Fitzmartin faced the fact that this case had no evidence and he had punished Plaintiff as long as possible. Rather than embarrass himself professionally and take the no-evidence case to trial, Fitzmartin had the charges against Plaintiff dismissed just two weeks prior to the trial. Therefore, the action was terminated in Plaintiff's favor.

**Plaintiff is Target**

110.    Years before the death of Ira Tobolowsky, Plaintiff had some legal issues with a contractor who stole $10,000 from Plaintiff in Austin, Texas. Michael sourced out this contractor and became his attorney, crafting another opportunity to harass Plaintiff.

111.    In August 2019, Michael emailed Plaintiff a threatening letter, demanding Plaintiff remove content from a website that had dozens of archived negative reviews about the contractor. The contractor had sued Angie's List to have them removed. Plaintiff posted them.

112.    Michael's letter made multiple demands, including: "Delete all content on, and relinquish ownership of the domain name and website." Following Michael's list of demands he threatened Plaintiff as follows:

> "Allow me to be exceedingly clear - your campaign to harass, harm, damage, intimidate, and threaten my client will no longer be tolerated. While I am hopeful that you will comply with the terms of this demand letter, make no mistake, if you refuse to so comply, I will immediately begin taking all steps necessary to force you to do so. **I will be unwavering in my pursuit to have you indicted and prosecuted for any and all criminal acts you have committed**, both in Texas and Florida." (emphasis added)

113.    In fact, under Florida law, Michael's letter is criminal extortion under Florida law. Florida Statute 836.05(1) provides: Whoever by written communication maliciously threatens to accuse another of any crime or offense commits a felony of the second degree. Perhaps the risk Michael took was worth it.

114.    If not for Michael, Plaintiff would never have been arrested.[14]

115.    If not for Michael, Plaintiff would never have been indicted.

116.    If not for Michael, Plaintiff would never have been extradited.

117.    The outrageous conduct of Defendants caused Plaintiff's arrest and 625 days of incarceration. Plaintiff, a 63-year-old senior citizen, had never been charged with a crime, had never been indicted, and had never spent a night in jail. Without probable cause, Defendants deceitful, malicious, and extreme conduct caused Plaintiff to be indicted with three capital murder charges that emanated from perjured testimony.

---

[14] Michael is responsible for planning both of Plaintiff's only arrests, the October 20, 2016 sham arrest for prostitution and the April 27, 2022 sham arrest for capital murder.

118.    On January 12, 2024, two weeks before trial in *The State of Texas vs. Steven Aubrey*, Fitzmartin, filed a motion to dismiss the capital murder charges against Plaintiff, stating **"it has been determined that the state is unable to make a prima facie case at this time,"** finally releasing Plaintiff from confinement. If the state was unable to make a case on the 625th day of Plaintiff's incarceration, it stands to reason the state was not have been able to make a case the month before or the year before Fitzmartin asked the court to dismiss the case. From day one, the state never had a case and Fitzmartin knew this, or should have known this, prior to Plaintiff's indictment. For the nearly two years Plaintiff languished in jail, Fillingim, Fitzmartin, and Fry enjoyed their freedom.

## X.  CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983
### Unlawful Searches and Seizures
(Against All Defendants)

119.    Plaintiff repeats and incorporates by reference ¶¶ 1–118, specifically ¶¶ 44-97 above, as though fully set forth herein.

120.    Defendants at all times relevant to this action were acting under color of state law.

121.    Fillingim, Fitzmartin, and Fry unlawfully deprived Plaintiff of his person without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

122.    Fillingim's Affidavit included false statements and had material omissions in his affidavit in support of the arrest warrant. Fillingim's perjured testimony before the Dallas County grand jury, at Fitzmartin's direction, violated Plaintiff's right to be free from

unreasonable searches and seizures under the Fourth Amendment and his right to due process of law under the Fourteenth Amendment.

123.    Fillingim, Fitzmartin, and Fry made an unreasonable and warrantless seizure of Plaintiff's person in violation of the Fourth Amendment to the Constitution of the United States as incorporated and applied to the states by way of the Fourteenth Amendment to the Constitution of the United States.

124.    Defendant's actions were a direct and proximate cause of the constitutional deprivation suffered by Plaintiff.

125.    As a direct and proximate result of Defendants' unreasonable and unlawful actions, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT II**
**42 U.S.C. § 1983**
**False Arrest**
(Against Fillingim)

126.    Plaintiff repeats and incorporates by reference ¶¶ 1–125, specifically ¶¶ 44-62 above, as though fully set forth herein.

127.    Fillingim at all times relevant to this action were acting under color of state law.

128.    Fillingim, who through affiliated officers, deputies, employees, and agents, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unlawful and false arrests. The lack of probable cause to arrest Plaintiff would have been evident to any reasonable law enforcement agency and/or officer

based on the true facts and circumstances within Fillingim's knowledge at the time. Fillingim did not witness Plaintiff break any law, nor did he have any reason to believe that Plaintiff had broken any law.

129.    Any reasonable police officer would have known that arresting Plaintiff under these circumstances would violate his constitutional rights.

130.    As a direct and proximate result of Fillingim's unreasonable and unlawful actions, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT III**
**42 U.S.C. § 1983**
**False Imprisonment**
(Against All Defendants)

131.    Plaintiff repeats and incorporates by reference ¶¶ 1–130, specifically ¶¶ 44-97 above, as though fully set forth herein.

132.    Defendants at all times relevant to this action were acting under color of state law.

133.    Plaintiff was arrested without probable cause, in violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizure.

134.    Pursuant to Plaintiff's arrest, he was transported to the Broward County jail and deprived liberty without due process or his consent, in violation of Plaintiff's Fourteenth Amendment rights.

135.   Defendants caused this unlawful detention by arresting and detaining Plaintiff without probable cause.

136.   Fillingim's actions caused Plaintiff to be detained initially and the actions of Fitzmartin and Fry caused the detention to continue for 625 days.

137.   Plaintiff was intentionally and unlawfully detained and restrained when he was unlawfully seized and deprived of his liberty without any reasonable cause or color of authority and maintained such complete restraint and deprivation for 625 days.

138.   This unlawful restraint of the Plaintiff's liberty was also accomplished by Defendants confining him to an area in which he did not wish to be confined.

139.   At all times material to this action, and at all times during which Plaintiff was being unlawfully restrained, Plaintiff was restrained against his will, and without consent, so that he was not free to leave his place of confinement.

140.   As a direct and proximate result of the Defendants' unreasonable and unlawful detention of Plaintiff, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT IV**
**42 U.S.C. § 1983**
**Deprivation of Rights Under Color of Law**
(Against All Defendants)

141.   Plaintiff repeats and incorporates by reference ¶¶ 1–140, specifically ¶¶ 44-97 above, as though fully set forth herein.

142.    Defendants at all times relevant to this action were acting under color of state law.

143.    Defendants were exercising the authority given to them by the government when their unlawful actions were taken with the appearance that the government authorized it and this conduct deprived Plaintiff of rights, privileges, or immunities guaranteed under federal law or the U.S. Constitution.

144.    The provision under 18 U.S.C. § 242 makes it a crime for Defendants acting under color of law to willfully deprive Plaintiff of a right protected by the Constitution or laws of the United States. Acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, judges, and others who are acting as public officials.

145.    Fillingim was acting in his official as police officer when he perjured his Affidavit that was used to obtain the warrant to arrest Plaintiff. Fillingim perjury violated Plaintiff's rights and privileges under the constitution.

146.    Acting in his capacity as a judge, Fry denied Plaintiff his right to challenge the legality of his false arrest when he refused to conduct the August 18, 2022 hearing on Plaintiff's Writ. Fry's actions were a criminal act under Florida law and his criminal act violated Plaintiff's protections under rights and privileges under the constitution.

147.     While acting in his capacity as an assistant district attorney, Fitzmartin actions caused Plaintiff to remain detained in jail for 625 days, violating Plaintiff's rights and privileges under the constitution.

148.     As a direct and proximate result of the Defendants' acts under color of state law, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT V**
**42 U.S.C. § 14141**
**Law Enforcement Misconduct**
(Against Fillingim)

149.     Plaintiff repeats and incorporates by reference ¶¶ 1–148, specifically ¶¶ 44-62 above, as though fully set forth herein.

150.     Fillingim at all times relevant to this action were acting under color of state law.

151.     Fillingim presented his perjured Affidavit to a magistrate to obtain the warrant used to arrest Plaintiff, depriving Plaintiff of rights, privileges, or immunities secured or protected by the Constitution and laws of the United States.

152.     As a direct and proximate result of Fillingim's misconduct, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

## COUNT VI
### 42 U.S.C. § 1983
### Malicious Prosecution
(Against All Defendants)

153.     Plaintiff repeats and incorporates by reference ¶¶ 1–152, specifically ¶¶ 44-97 above, as though fully set forth herein.

154.     Defendants at all times relevant to this action were acting under color of state law.

155.     Defendant Fillingim was acting outside the course and scope of his employment with the Dallas Police Department. Defendant Fitzmartin was acting outside the course and scope of his employment with the Dallas County District Attorney's Office. Defendant Fry was acting outside the course and scope of his employment with Broward County when he committed a crime against Plaintiff under Florida Statute 941.11.

156.     Defendants caused the commencement and/or continuation of criminal proceedings against Plaintiff. The subject proceedings had bona fide terminations in Plaintiff's favor in that the charges against Plaintiff were dismissed in Plaintiff's favor.

157.     There was no probable cause or reasonable basis in fact or in law for Defendants to cause the commencement of the criminal proceedings against Plaintiff.

158.     Defendants acted intentionally and with malice in initiating the criminal proceedings against the Plaintiff, as well as in making the arrest of Plaintiff, and Defendants knew their actions against Plaintiff were not supported by even arguable probable cause.

159.     As a direct and proximate result of the Defendants' malicious prosecution, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation,

lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

## COUNT VII
### Florida State Law Claim - Harassment
(Against All Defendants)

160.    Plaintiff repeats and incorporates by reference ¶¶ 1–159, specifically ¶¶ 44-97 above, as though fully set forth herein.

161.    Defendants at all times relevant to this action were acting under color of state law.

162.    Fillingim perjured affidavit was presented to the magistrate to cause the arrest of Plaintiff, violating Plaintiff's protections under Florida Statute 784.048.

163.    Fry denied Plaintiff his right to challenge the legality of his false arrest when he refused to conduct the August 18, 2022 hearing on Plaintiff's Writ. Fry's actions were a criminal act under Florida Statute 941.11 and his criminal act violated Plaintiff's protections under Florida Statute 784.048.

164.    Without evidence to take Plaintiff's case to trial, Fitzmartin actions caused Plaintiff to remain detained in jail for 625 days, violating Plaintiff's protections under Florida Statute 784.048.

165.    Florida Statute 784.048 protects Plaintiff's right to be free from conduct directed at a him that causes substantial emotional distress and serves no legitimate purpose. Each of Defendant's harassing actions directed at Plaintiff served no legitimate purpose, evidenced by dismissal of the charges against Plaintiff, and caused substantial emotional distress.

166.    As a direct and proximate result of the Defendants' harassment, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of

capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

## COUNT VIII
### Florida State Law Claim
### Intentional Infliction of Emotional Distress
(Against All Defendants)

167.    Plaintiff repeats and incorporates by reference ¶¶ 1–166, specifically ¶¶ 44-97 above, as though fully set forth herein.

168.    Defendants at all times relevant to this action were acting under color of state law.

169.    Fillingim unlawfully seized Plaintiff while Fitzmartin and Fry intentionally and unlawfully detained and restrained him for 625 days, depriving Plaintiff of his liberty without any reasonable cause or color of authority.

170.    This conduct by Defendants constituted extreme and outrageous conduct that would shock the conscience of a reasonable person and goes beyond all bounds of decency. Defendants conduct was the proximate cause of Plaintiff's emotional distress and Plaintiff's emotional distress was severe.

171.    Defendants' malicious actions that incarcerated Plaintiff for 625 days was beyond all bounds of decency.

172.    Defendants acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, Plaintiff humiliation, mental anguish, and substantial and enduring emotional distress. To the extent that said outrageous conduct was perpetrated by certain agents of Defendants, Defendants authorized and ratified the conduct with the

knowledge that Plaintiff's emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the deleterious consequences to Plaintiff.

173.    As a direct and proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay, and benefits, and consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

174.    As a further direct and proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered and continues to suffer general damages including but not limited to significant and enduring emotional distress including humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

175.    Defendants' actions were fraudulent, malicious and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

176.    As a direct and proximate result of the Defendants' outrageous, unreasonable and unlawful actions, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

**COUNT IX**
**Florida State Law Claim**
**Negligent Infliction of Emotional Distress**
(Against All Defendants)

177.    Plaintiff repeats and incorporates by reference ¶¶ 1–176, specifically ¶¶ 44-97 above, as though fully set forth herein.

178.    Defendants at all times relevant to this action were acting under color of state law.

179.    This cause of action arises from emotional shock suffered by Plaintiff as a result of Defendants' extreme and intentional outrageous conduct that caused Plaintiff severe and ongoing emotional distress. Defendants' conduct would be considered shocking or scandalous by an average member of the community.

180.    Defendants acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, Plaintiff humiliation, mental anguish, and substantial and enduring emotional distress. To the extent that said outrageous conduct was perpetrated by certain agents of Defendants, Defendants authorized and ratified the conduct with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the deleterious consequences to Plaintiff.

181.    Defendants were complicit with the fact that Plaintiff was innocent, arrested without probable cause, and incarcerated for almost two years without evidence to take the case to trial. Their negligence psychologically traumatized Plaintiff and caused physical injury.

182.    As a direct and proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered special damages including but not limited to loss of wages, including front and back pay, and benefits, and consequential damages in an amount to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

183.    As a further direct and proximate result of Defendants' actions against Plaintiff, as alleged above, Plaintiff has suffered and continues to suffer general damages including but

not limited to significant and enduring emotional distress including public humiliation, mental anguish and physical distress, injury to mind and body, in a sum to be proven at time of trial, in excess of the minimum jurisdictional requirements of this Court.

184.    Defendants' actions were fraudulent, malicious and oppressive. Plaintiff is thus entitled to and herein seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial, to punish Defendants and deter Defendants and others from engaging in similar future conduct.

## COUNT X
### Florida State Law Claim - Abuse of Process
(Against All Defendants)

185.    Plaintiff repeats and incorporates by reference ¶¶ 1–184, specifically ¶¶ 44-97 above, as though fully set forth herein.

186.    Defendants at all times relevant to this action were acting under color of state law.

187.    Defendants illegally used the criminal justice system to arrest and incarcerate Plaintiff. Fillingim perjured his Affidavit used against Plaintiff. Fitzmartin improperly caused Plaintiff's indictment and kept Plaintiff in jail for 625 days though he never had a prima facia case against him. Fry committed a criminal act against Plaintiff, denying to hear his habeas corpus motion. Defendants' actions were illegal and improper use of process.

188.    Defendants' ulterior motive was to do Michael's bidding and punish Plaintiff. Their pursuit of this no-evidence case, ultimately dismissed in Plaintiff's favor, proves they had an ulterior motive.

189.    Defendants' egregious acts resulted in Plaintiff's 625-day incarceration injury.

190.    All Defendants' actions described above denied Plaintiff's equal rights under the law.

191.    Defendants acted with malice or with reckless disregard for Plaintiff's rights. As a direct and proximate result of Defendants' abuse of process, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

## COUNT XI
## 42 U.S. Code § 1985(3)
## Conspiracy Liability
(Against All Defendants)

192.    Plaintiff repeats and incorporates by reference ¶¶ 1–191, specifically ¶¶ 44–118 above, as though fully set forth herein.

193.    Defendants at all times relevant to this action were acting under color of state law.

194.    Defendants' civil conspiracy violated Plaintiff's constitutional rights and other rights.

195.    Defendants agreed to commit and did commit unlawful and tortious acts against Plaintiff. They acted collectively in doing so, including but not limited to conducting illegal searches on Plaintiff's person, illegally arresting and detaining Plaintiff, causing the malicious criminal prosecution of Plaintiff, making illegal false sworn statements in official documents regarding Plaintiff, and violating the civil and constitutional rights of Plaintiff against illegal

search and seizure of Plaintiff's person, and his illegal and improper detention, prosecution and incarceration, for which there was no justification or legal basis.

196.    On April 27, 2022, Fillingim and other officers and deputies agreed to unlawfully seize Plaintiff without reasonable suspicion or probable cause that Plaintiff had committed a crime, in violation of Plaintiff 's Fourth Amendment rights. Fillingim traveled to Broward County with a female DPD officer to participate in Plaintiff's arrest. The unidentified female was part of the plan to seize Plaintiff without probable cause.

197.    In May 2022, Fitzmartin and Fillingim agreed that Fillingim would perjure his testimony to a Dallas County Grand Jury to cause the indictment of Plaintiff. Fillingim did perjure himself and he withheld all material exculpatory evidence to secure the indictment in violation of Plaintiff's Fourth Amendment rights.

198.    On July 26, 2022, Fry admitted he had an ex parte phone conversation with Michael Tobolowsky. The agreement between them ended Plaintiff's promise to present his Writ at an August 18, 2022 hearing.

199.    On July 28, 2022, Fry issued an order denying Plaintiff's Writ without considering the motion, causing Plaintiff's continued incarceration for an additional 499 days, in violation of Plaintiff's Fourth Amendment rights.

200.    On December 1, 2022, Fitzmartin came to an agreement with Michael and the judge presiding over Plaintiff's criminal case in Dallas to deny the reduction of Plaintiff's $2 million bond. With no probable cause to justify Plaintiff's incarceration, the Court ruled against reducing the bond, which forced Plaintiff to continue to be detained without cause, in violation of his Fourth Amendment rights.

201.    Defendants conspired with each other and with other third parties to deprive Plaintiff his equal protection of the laws, which caused injury to Plaintiff.

202.    Defendants acted with malice or with reckless disregard for Plaintiff's rights. As a direct and proximate result of Defendants' conspiracies, Plaintiff has suffered damages, which include: mental anguish, pain and suffering, bodily injury, loss of capacity for the enjoyment of life, embarrassment, public humiliation, loss of reputation, lost employment opportunities, lost wages, and the loss of other emoluments. These damages have occurred at present, in the past and will most likely occur in the future.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

Under Civil Practice Law & Rules 208, the limitations period for claims of prisoners serving less than a life term is tolled during the time the individual is disabled based on his incarceration, but not to exceed two years. Plaintiff's incarceration disabled his ability to bring these claims for the 625 days he spent in the Broward County and Dallas County jails.

## VII. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants be required to appear and answer herein, and that upon trial hereof, Plaintiff have judgment against Defendants as follows: Judgement against Defendant for Plaintiff's actual damages in an amount within the jurisdictional limits of this Court and proven at time of trial;

A.    For an award of compensatory damages, special damages, exemplary damages and consequential damages against All Defendants, jointly and severally, for amounts that exceed the minimal jurisdictional limits of this court;

B.    For an award of nominal damages against All Defendants, jointly and severally;

C.   For an award of Plaintiff's attorney's fees and costs incurred in prosecution of this action against Defendants, jointly and severally;

D.   For such other and further equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff requests trial by jury in this above-styled action.

Respectfully submitted,

By: _____

Steven B. Aubrey, Pro Se
3303 NE 3rd Ave
Oakland Park, FL 33334
Telephone: (561) 560-9367
defamationperse@yahoo.com

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case- related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  July 26, 2024.

_____

Steven B. Aubrey

# Exhibit   A

**STATE OF TEXAS          AFFIDAVIT FOR ARREST WARRANT          COUNTY OF DALLAS**

1. BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant who, after being duly sworn by me, on oath stated: My name is **Brian Fillingim #9779** and I am a peace officer of the City of Dallas, Dallas County, Texas. I, the affiant, have good reason and do believe that on or about the **13th** day of May 20**16**, one Steven Aubrey did then and there in the City of Dallas, Dallas County, Texas commit the offense of **Capital Murder**, a violation of Section **19.03** of the **Texas Penal Code**, a **Capital Felony**.

2. Affiant's belief is based upon the following facts and information which Affiant received from:
   ☒ Affiant's personal investigation of this alleged offense.
   ☐ _____, a fellow peace officer of the City of Dallas, Dallas County, Texas, who personally participated in the investigation of this alleged offense, providing this information to Affiant, and whose information Affiant believes to be credible.

3. Suspect Steve Aubrey was involved in civil litigations with his mother, Betsy Aubrey, regarding the Aubrey Family Trust. Betsy Aubrey informed Suspect Aubrey via email that she was removing him from her will in December 2012. Suspect Aubrey responded with an ultimatum that Betsy had 3 days to change her mind or else Suspect Aubrey would "make it my mission to make the rest of your life miserable, as you deserve." Three days later, Suspect Aubrey emailed Betsy Aubrey that his brother, Tom, had calmed him down and that he had decided "not to unleash Jehad" on her just yet. He went on to say that he was lifting his 3-day ultimatum and was going to make the first of the year the new deadline. In January 2013, Betsy Aubrey removed Suspect Aubrey as a beneficiary of her estate. This lead to multiple court filings and court orders involving Betsy Aubrey and Suspect Steve Aubrey. Suspect Aubrey was living in Austin, TX at the time and Betsy was in Dallas, TX.

4. In mid 2014, Complainant Ira Tobolowsky, a Dallas based attorney, began representing Betsy Aubrey in the litigations against Suspect Aubrey. Suspect Aubrey was not doing well in the court proceedings and turned his anger towards Mr. Tobolowsky. Suspect Aubrey began sending anti-Semitic emails to Complainant Tobolowsky and later created bogus web pages with defamatory blogs, which included a doctored photograph of Complainant Tobolowsky behind prison bars. In July 2015, Complainant Tobolowsky filed a defamation suit against Suspect Steve Aubrey.

5. In February 2016, Suspect Aubrey and his spouse, Brian Vodicka, moved from Austin to Dallas. The couple had been financially devastated by bad business ventures including an alleged Cayman Island pump and dump scheme and a real estate fraud scheme involving Victor and Natalia Wolf, who are currently wanted by the FBI. Also in February 2016, Suspect Aubrey was written out of his inheritance, a loss of an estimated $900K-1.6 Million, ordered to pay $250K in sanctions to Betsy Aubrey, and was found to be a vexatious litigant due to his abuse of the court system, which resulted in lawsuits being dismissed and required Suspect Aubrey to present/pay a security of $150K prior to filing new lawsuits. All this while still engaged in a defamation suit with Complainant Tobolowsky. Suspect Aubrey sent a text message about moving to Dallas which read "I hate to move but that's where I can make the most money and deal with Ira."

6. Mr. Aubrey and Mr. Vodicka lived in an apartment together at 7777 Glen America Dr, apartment number 223, in Dallas. Mr. Aubrey rented a different apartment, located at 8617 Southwestern Blvd (#911) for business. Mr. Aubrey worked as an unlicensed massauer and utilized the apartment on Southwestern Blvd as his massage studio.

7. On March 17th, 2016, Suspect Aubrey had a deposition on the defamation case. Mr. Aubrey denied a majority of the evidence regardless of source or legitimacy. On April 8th, 2016, Mr. Vodicka had his deposition for the defamation case. Mr. Vodicka was incoherent and appeared to be heavily medicated. Complainant Tobolowsky's attorney on the case, Steve Schoettmer, attempted to reschedule the event for a later date in an attempt to allow Mr. Vodicka to give a better statement. The deposition escalated to the

114044-2016

**STATE OF TEXAS**          **AFFIDAVIT FOR ARREST WARRANT**          **COUNTY OF DALLAS**

point that Complainant Tobolowsky threatened to call the police if Suspect Aubrey and Mr. Vodicka did not leave the location.

8. On Friday, May 13th, 2016, at approximately 7:45 AM, Complainant Ira Tobolowsky exited his home, located at 7435 Kenshire Ln, Dallas, into his attached garage. He opened the garage door, walked down the stairs, and walked behind the parked vehicles. Complainant Tobolowsky had a spine condition causing him to move slowly, hunch his shoulders, struggle to lift his arms above his chest, and struggle to turn his neck. Once he neared his vehicle, it is believed that Suspect Aubrey approached him in the garage and assaulted Mr. Tobolowsky. Suspect Aubrey then doused Complainant Tobolowsky with gasoline and set him on fire, which caused Mr. Tobolowsky's death. The Medical Examiner ruled his death as a homicide as a result of thermal burns, smoke inhalation, and blunt force trauma. It was noted that Mr. Tobolowsky suffered a fracture and separation of the cervical spinal column; and fractures of the left clavicle and multiple ribs. An Ocean Spray cranberry juice bottle containing gasoline was located in the garage.

9. Dallas Fire/Rescue responded and discovered that Mr. Tobolowsky was deceased next to the driver door of his vehicle. Dallas Arson Investigators also responded and requested assistance from the Dallas Police Homicide Unit. Dallas Police Detective R. Ermatinger #5051 later became lead on the case.

10. Suspect Aubrey quickly became a person of interest in the case. Multiple attempts were made to speak with Suspect Aubrey and Mr. Vodicka, however neither responded to investigators. On May 18th, 2016, detectives obtained warrants to examine, photograph, and fingerprint both Suspect Aubrey and Mr. Vodicka. On May, 19th, 2016, Suspect Aubrey and Mr. Vodicka were located and brought to Jack Evans Police Headquarters for the execution of the warrants and for questioning regarding the murder. Mr. Vodicka spoke with Detective Ermatinger. During the conversation, Mr. Vodicka advised Det. Ermatinger to look at the phone tower ping locations three times, something not commonly said by citizens during police interviews. Det. Ermatinger asked if Mr. Vodicka drinks cranberry juice, to which Mr. Vodicka says that he only drinks the Costco brand with the red cap. Mr. Vodicka also stated that they would not get a fair trial due to media coverage. Mr. Vodicka gave consent to having his vehicle searched/processed and also gave consent to have a forensic data extraction of his cell phone. Mr. Vodicka was fingerprinted, photographed, and examined for burns or injuries but nothing was observed.

11. Suspect Aubrey declined to speak with detectives. Detectives Ermatinger and D. Richardson #6361 both noted redness that looked like a healing burn of some kind on his hands and lower arms. Dr. Alexander Eastman MD, MPH, FACS, was requested to further examine Suspect Aubrey. Dr. Eastman noted that there were areas of blanching erythema in splotchy pattern overlying both hands, wrists, and forearms. In addition, there were areas where it appeared there was no normal hair. Dr. Eastman stated that this could be consistant with healing, superficial thermal injury. Suspect Aubrey declined consent for the processing of his vehicle and data extraction of his phone. Suspect Aubrey's vehicle and phone were seized to prevent destruction of evidence and to obtain a warrant. Both Mr. Vodicka and Suspect were released. Suspect Aubrey contacted Det. Ermatinger the next day and signed consent forms for his vehicle, phone, and computers.

12. Also on May 19th, 2016, the Tobolowsky family found a hole drilled in their fence on the back of the property. The hole was drilled then painted over to look like a natural knot in the wood. The hole was in a location that someone could look from the alley and have a direct line of site at the Tobolowsky garage. The location of the hole was in close proximatey to the gate where you could acccess to the backyard and garage. It is believed that the hole was created to watch Mr. Tobolowsky and learn his daily routine. The height of the hole was never released.

13. During the investigation, multiple search warrants were conducted at both apartments controlled by Suspect Aubrey and Mr. Vodicka. At the apartment located at 7777 Glen America, detectives seized a

Continuation: 114044-2016

STATE OF TEXAS            AFFIDAVIT FOR ARREST WARRANT            COUNTY OF DALLAS

drill, drill bits, and paint products believed to be used in creating the hole in the Tobolowsky fence. Electronic devices were also seized and submitted to the North Texas Regional Crime Lab for analysis. A laptop at the location showed to be in the process of erasing data and after analysis it was discovered that pass number 7 had completed in the disk utility wipe process. Google map searches were located for 7400 Kenshire Ln (Complainant Tobolowsky's home), Tobolowsky & Burk Law Firm, and Shearith Israel Synagogue, which is where Complainant Tobolowsky attended religious services. Google searches for "Sparkman Hillcrest Ira Tobolowsky" (the cemetery where Complainant Tobolowsky is buried), "Michael Tobolowsky" (one of Complainant Tobolowsky's children), "Walmart tracfone", "burner phone", and "alibi definition" were located on the same computer.

14. A search of the apartment located at 8617 Southwestern Blvd recovered propane torches and clothing belonging to Suspect Aubrey. The clothing was submitted to the Southwestern Institute of Forensic Sciences for testing. The clothing returned with ignitable liquid residue 2-ethyl-1-1-hexanol. The evidence supervisor later informed Det. B. Fillingim #9779 that the amount of liquid residue was substantially higher than expected or previously seen.

15. In November 2016, Suspect Aubrey and Mr. Vodicka moved to Florida and little new evidence on the case was gathered. In 2017, D Magazine published a story on the murder and investigation. In April 2017, Michael Tobolowsky received an anonymous letter stating that the author of the letter had committed the murder. The Tobolowsky family continued the defamation case on behalf of Complainant Tobolowsky and were awarded a large judgement. In 2018 and 2019, Suspect Aubrey uploaded various blogs and court documents online, readily available to the public. These documents contain case details and his alibi.

16. The author of the anonymous confession letter was discovered to be Robin Chiswell, a friend of Suspect Aubrey and Mr. Vodicka. Mr. Chiswell later admitted to writing the letter but denied any involvement in the murder. Evidence later proved that Mr. Chiswell was not involved in the murder.

17. In July 2021, Detective B. Fillingim #9779 was assigned the case and began reviewing the evidence. Det. Fillingim executed multiple GeoFence warrants, however none of the returns could locate Suspect Aubrey's cell phone. Along with not locating Suspect Aubrey's device, no new suspects came into light. While looking over the crime scene photographs taken during the search of apartment located at 7777 Glen America, Det. Fillingim noticed a book on the nightstand titled "Future Crimes", written by Marc Goodman. Det. Fillingim ordered the book and located at least four references to cell phone GPS tracking and locations. It is believed that Suspect Aubrey utilized this book to educate himself and turn off various apps that could track his movements or simply left his phone at home during the commission of the murder. This would also explain how Mr. Vodicka knew about tower ping locations, which he mentioned 3 times in the interview with Det. Ermatinger.

18. Det. Fillingim also observed a photo of Suspect Aubrey and Mr. Vodickas pantry which contains a bottle of Kroger brand cranberry juice. That juice bottle has a white cap and disproves Mr. Vodickas claim that they only drink Costco brand juice with the red cap.

19. Text messages on Suspect Aubrey's phone show that he texted a longtime friend, Alejandro "Yente" Juaristi, on May 13th, at 7:36 PM, that Complainant Tobolowsky had died. Mr. Juaristi responded by telling Suspect Aubrey that he hopes he has his alibi ready. On May 14th, Robin Chiswell sent Suspect Aubrey a message that stated "My favorite song is Disco Inferno! Lol!"

20. Also, in Suspect Aubrey's phone were emails from an associate named Ken Murphy. Searches of Suspect Aubrey's phone, Gmail account, and computer found various communications with Mr. Murphy. Suspect Aubrey reached out to Mr. Murphy the evening of the murder asking for legal advice about dealing with

STATE OF TEXAS          AFFIDAVIT FOR ARREST WARRANT          COUNTY OF DALLAS

detectives. Mr. Murphy advised "high caution" talking with investigators. During the email thread, Mr. Murphy mentioned how Suspect Aubrey had informed him about an intense hatred for the "nasty lawyer" and how Aubrey wished "he was dead", both referencing Complainant Tobolowsky. Suspect Aubrey shared a news story to Mr. Murphy, to which Mr. Murphy responded that Suspect Aubrey "took it to a whole nother level when ya dun threw gas on his ass and torched the motherfucker." A document in Suspect Aubrey's computer was found appearing to be from Mr. Murphy which he tells Suspect Aubrey to "keep me abreast of developments, and don't kill anyone...again."

21. Det. Fillingim discovered an email thread between Suspect Aubrey and the author of the D Magazine article, Jamie Thompson, while she was gathering information for her story. During the exchange, Suspect Aubrey made a reference to the height of the hole in the fence. Suspect Aubrey was familiar with the height even though it had never been released publicly in any form.

22. Hours after the murder, Suspect Aubrey had gone to a scheduled dermatologist appointment at 12:30 PM to have stitches removed from his back. At 1:43 PM, the same dermatologist office called and left Suspect Aubrey a voicemail about his inquiry about IPL, specifically to his hands and arms. IPL is Intense Pulse Light and commonly called a photofacial. The procedure targets red/brown tones and the heat absorbed by the target areas would stimulate skin cells to regenerate. According to the dermatologists Det. Fillingim spoke with, a burn would need to be healed prior to treatment, but it would greatly reduce/eliminate any scarring or skin discoloration along with regenerating collagen.

23. While reading Suspect Aubrey's blogs and court documents that he uploaded online, Det. Fillingim found what can only be interpreted as his alibi. Suspect Aubrey claims that he awoke on the day of the murder around 8:00 AM his apartment located 7777 Glen America and was at there until approximately 9:00 AM, at which time he drove to a nearby Trader Joe's supermarket for grocery shopping.

24. Det. Fillingim located the Oncor electric records for Suspect Aubrey's business apartment on the day of the murder. There is a slight power surge at approximately 6:00 AM, then another larger surge at approximately 7:45-8:00 AM. Det. Fillingim obtained the maintenance records for his apartment during his lease period. Suspect Aubrey had four (4) work orders, which were completed on March 15th and April 12th. Maintenance staff did not enter the apartment on the day of the murder and Suspect Aubrey did not report any type of burglary, theft, etc. at the apartment. The only explanation is that Suspect Aubrey, himself, entered the apartment. The propane torches initially seized were at this location.

25. Det. Fillingim obtained the Trader Joe's receipt from when Suspect Aubrey went grocery shopping. While the receipt does show the sale was made at 9:23 AM, Suspect Aubrey only spent $8.97 and purchased 2 packages of Roma tomato salsa bruschetta and ciabatta bread.

26. Det. Fillingim obtained Suspect Aubrey's Google voice text messages which were used for his massage business. There are multiple text threads where Suspect Aubrey tells clients that he moved to Florida and that Dallas was only a pitstop. Suspect Aubrey explains in other texts his reasoning for moving to Florida, which is that previous investigators lied on affidavits and that the media was out to destroy him. None of his texts include any type of denial statement regarding the murder.

27. Det. Fillingim utilized credit card statements for Suspect Aubrey and Mr. Vodicka to log dining habits from February-May, the time they moved to Dallas until the murder. These are only verified by credit card transactions and do not account for cash purchases. Suspect Aubrey eats out regularly, 3-6 times per week, at Whataburger, Taco Bell, KFC, and CiCi's pizza. Mr. Vodicka frequents Whataburger, Raising Canes, In-N-Out, and Krispy Kreme. There were occasional trips to El Fenix and Snuffers, plus 1 meal at Maggianos for $57.30, and 1 meal at Pappadeaux for $54.25. The evening of the murder, Mr. Vodicka calls and makes a reservation under Suspect Aubrey's name at Lawry's Prime Rib. Suspect Aubrey and

Continuation: 114044-2016

**STATE OF TEXAS**          **AFFIDAVIT FOR ARREST WARRANT**          **COUNTY OF DALLAS**

Mr. Vodicka go to their reservation the day after the murder, May 14th, and spend $146.14, almost triple what they had previously spent at any restaurant in the last 4 months.

28. Det. Fillingim reached out to Ed Nordskog, a renowned fire death scene expert, criminal profiler, and case analyst. Mr. Nordskog reviewed photos, documents, and reports of the murder to provide his expert analysis. Mr. Nordskog's report notes a burn anomaly on Complainant Tobolowsky's left thigh that does not match the fuel packages and fire progression at the crime scene. Mr. Nordskog stated that this anomaly is consistent with the results of a torch on the skin. It was Mr. Nordskogs opinion that the use of a torch could create a wound consistent with that which was on Complainant Tobolowsky's inner thigh.

29. Due to the overwhelming amount of evidence collected on this case, not all case details have been included in this report. It is believed that Suspect Steven Aubrey waited in the alley of Complainant Tobolowsky's residence, stalking him until the opportune time to act on his plan of attack. Suspect Steven Aubrey intentionally and knowingly entered Complainant Tobolowsky's garage, assaulted Mr. Tobolowsky, doused Mr. Tobolowsky with gasoline, and set Mr. Tobolowsky on fire with a torch, which caused his death.

_____ # 9779

**AFFIANT**

WHEREFORE, Affiant requests that an arrest warrant be issued for the above accused individual in accordance with the law.

SUBSCRIBED AND SWORN TO BEFORE ME on the _____ day of _____ 20 22

_____
Magistrate or Judge, in and for Dallas County, Texas

**MAGISTRATE'S or JUDGE'S DETERMINATION OF PROBABLE CAUSE**

On this the _____ day of _____ 20 22.
I hereby acknowledge that I have examined the foregoing affidavit and have determined that probable cause exists for the issuance of an arrest warrant for the individual accused therein.

_____
Magistrate or Judge in and for Dallas County, Texas

Continuation: 114044-2016

# Exhibit  B



The State of Texas vs. STEVEN BENTON AUBREY
DOB: 10/11/1960     Sex: Male     Race: White

291st

GJ Witness: Read In

| Offense | Agency |
|---|---|
| CAPITAL MURDER BY TERROR THREAT/OTHER FELONY | TXDPD0000 |

## INDICTMENT NO.: F2275689

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

The Grand Jury of Dallas County, State of Texas, duly organized at the January Term, A.D., 2022 of the 291st Judicial District Court for said County, upon its oath do present in and to said Court at said term,

That **STEVEN BENTON AUBREY**, hereinafter called Defendant, **on or about the 13th day of May, 2016** in the County of Dallas, State of Texas, did unlawfully then and there intentionally cause the death of IRA TOBOLOWSKY, an individual, hereinafter called deceased, by: SETTING THE DECEASED ON FIRE AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: FIRE, AND AN IGNITABLE LIQUID, AND SMOKE, AND BY INFLICTING BLUNT FORCE INJURY TO THE DECEASED AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: HIS HANDS, AND THE GROUND, AND AN UNKNOWN OBJECT, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY,
and the defendant was then and there in the course of committing and attempting to commit the offense of ARSON

and further

Did unlawfully then and there intentionally cause the death of IRA TOBOLOWSKY, an individual, hereinafter called deceased, by SETTING THE DECEASED ON FIRE AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: FIRE, AND AN IGNITABLE LIQUID, AND SMOKE,
AND BY INFLICTING BLUNT FORCE INJURY TO THE DECEASED AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: HIS HANDS, AND THE GROUND, AND AN UNKNOWN OBJECT, THE EXACT NATURE AND DESCRIPTION OF WHICH IS UNKNOWN AND UNKNOWABLE TO THE GRAND JURY,
and the defendant was then and there in the course of committing and attempting to commit the offense of BURGLARY of said deceased,

Against the peace and dignity of the State.

_Maricza McKenzie_

Foreman of the Grand Jury

Page 1 of 1